In the Matter of TRANSPORT CLEARINGS–MIDWEST, INC., Bankrupt.

UNITED MISSOURI BANK OF KANSAS CITY, N.A., Plaintiff,

v.

Mendel SMALL, trustee in bankruptcy, Defendant.

Bankruptcy No. 78–01179–B–W–4.

United States Bankruptcy Court, W.D. Missouri, W.D.

Nov. 16, 1982.

Gene DeLeve, Kansas City, Mo., for plaintiff.

James C. Mordy, Kansas City, Mo., for defendant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT HOLDING PLAINTIFF'S SECURITY INTEREST IN COLLECTED FREIGHT CHARGES TO BE VALID AND PERFECTED AND HOLDING THAT IT DOES NOT EXTEND TO SPECIAL ASSESSMENTS

DENNIS J. STEWART, Bankruptcy Judge.

This is an action in which the plaintiff United Missouri Bank of Kansas City, N.A., seeks to enforce its allegedly valid and perfected security interest in the proceeds of freight bills collected by the bankrupt organization in the course of its business as a freight bill collector. The plaintiff also contends that its security interest also extends to certain "chargebacks" which the bankrupt organization has made against member carriers for uncollected or uncollectible freight bills or the like, and to certain "special assessments" which the bankrupt organization has made against its member carriers in connection with the conduct of certain litigation.[1] It is the primary position of the defendant trustee in bankruptcy that the defendant's security interest is not perfected; that the freight bills memorializing the shipments are properly classifiable under the Uniform Commercial Code only as "instruments" which must be in the possession of the secured party or an indepen-

---

1. For further elaboration of the character of the "chargebacks" and "special assessments," see pp. 288–289, *infra,* of the text of this memorandum.

dent party as bailee before the security interest can be regarded as perfected. See section 400.9–304(1) RSMo to the following pertinent effect:

"A security interest in chattel paper or negotiable documents may be perfected by filing. A security interest in instruments (other than instruments which constitute part of chattel paper) *can be perfected only by the secured party's taking possession* . . ." (Emphasis added.)

The trustee in bankruptcy further contends that the "chargebacks" and "special assessments" constitute "general intangibles" within the meaning of the Uniform Commercial Code and that the plaintiff's security interest is accordingly not perfected because the security agreement and financing statements do not contain any description of "general intangibles."

Even more fundamentally, the defendant trustee in bankruptcy contends that the plaintiff bank does not have any security interest in the proceeds of the freight charges because the relevant security agreement does not contain any description of "instruments" or "general intangibles."[2] This contention will be the subject of treatment later in this memorandum after the initial treatment of the subject of perfection is concluded.

### Perfection of the Security Interests

The plaintiff bank contends that the freight bills have no legal efficacy as instruments; that the freight charges are simply proceeds of accounts which are sufficiently described in the security agreement which has been executed in its favor; and that the bank has accordingly perfected its security interest in them by means of filing the appropriate financing statements containing sufficient descriptions of accounts.[3] See section 400.9–401(1)(c) RSMo.

In the developmental stage of this action, the plaintiff bank moved for summary judgment on the issues made by the pleadings. The court, on June 28, 1981, denied the motion for summary judgment on the basis of the following considerations:

"It remains an issue of fact, not conclusively established under the doctrine of *res judicata* or otherwise, whether the freight bills which are the subjects of this action are 'accounts' or 'instruments for the payment of money evidencing Borrower's accounts' within the meaning of the governing security agreement. The freight bills, or an exemplar of them, should be presented to the court by being adduced formally in evidence. Other evidence of the manner of the customary uses of the freight bills may conceivably also be presented or other evidence which may bear upon whether the freight bills are properly classifiable as 'accounts,' 'instruments . . . evidencing accounts,' 'instruments' or other category of property.

"The same principles apply with respect to the classification of the chargeback items. Much is said in the briefs which the court has been provided as to the legal ramifications which apply if the chargeback claims are classified as 'general intangibles' or as 'accounts.' Thus, in order that the evidence may clearly be presented to the court as to the character of the property in which the security interest is claimed, the motion for summary judgment must be denied and a date for the hearing accordingly set."

Thereafter, a trial of the factual issues was conducted by the court and the plaintiff thereupon demonstrated the filing of financial statements in accordance with the provisions of section 400.9–401 RSMo. The evidence, painstakingly adduced over a five-day period of trial by the respective counsel, demonstrated that the freight bills which are the subject of this controversy are issued by the carriers and reflect an obliga-

---

**2.** See pp. 287 and 288, *infra,* of the text of this memorandum.

**3.** "(S)ecurity interests in freight bills are uniformly transferred by carriers and clearing houses to their lenders without delivery of possession, and . . . lenders act to perfect those security interests by filing UCC–1 financing statements claiming them as 'accounts receivable' of the borrower." Plaintiff's Post-Trial Brief, p. 4.

tion of the carrier to transport and deliver goods; that the freight bills were purchased by the bankrupt organization and collected by the bankrupt organization; that the freight bills do not contain any formal signatures of the parties involved in the transactions reflected by the freight bills; that the freight bills do not contain any promise to pay for the delivery of the freight nor any other indicia of an ordinary contract; that the freight bills constitute on their face memoranda of the shipment undertaken to be accomplished by the carrier; that there are multiple copies of nearly all imaginable forms of freight bills; and that essentially the only characteristic which likens the freight bills to instruments within the meaning of the Uniform Commercial Code is that the names of the parties involved in the transaction are contained on the form.[4]

The legal issue which is thereby placed before the court in respect of the issue of perfection is whether the freight bills are "instruments" or whether the proceeds of their collection are simply "accounts" within the meaning of the Uniform Commercial Code. If the freight bills are in fact and law "instruments," then actual possession of them may be necessary to effect perfection of a security interest in them. See section 400.9–304(1), *supra.* And, under the

facts of this case, the security interest of the United Missouri Bank would not be characterizable as a perfected secured claim which can prevail over the claim of the trustee in bankruptcy under section 70c of the Bankruptcy Act. But, if the freight charges represented by the freight bills are to be regarded as "accounts," the United Missouri Bank of Kansas City has filed the financing statements which are necessary to accomplish perfection under section 400.-9–401(1)(c), *supra.*

Under the provisions of section 400.9–105(1)(g) RSMo, "instrument" is defined as "a negotiable instrument (defined in section 400.3–104), or a security (defined in section 400.8–102) or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." It is not contended that a freight bill can be categorized as a negotiable instrument, or a security, or a security agreement. It must therefore necessarily be contended that it is a "writing which evidences a right to the payment of money . . . and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." But, according to the evidence which has been adduced

---

4. Cf. Trustee's Proposed Findings of Fact and Conclusions of Law, pp. 13 ff., to the following pertinent effect:

"A freight bill is the document on which motor carriers are required to show certain items of information in regard to the shipment, such as the shipper, the consignee, their addresses, the points of origin and destination, a description of the goods transported, the number of pieces, the weight, the rate, and the total charge . . . Each freight bill has a 'pro' number, which is a progressive or sequential serial number that identifies that particular freight bill . . . A freight bill also designates whether the shipment is prepaid or collect . . . Carriers prepare their freight bills in multiple-copy form sets, interleaved with carbons, consisting of anywhere from four to twelve copies, depending upon each individual carrier's own needs for copies at different locations . . . One of the copies in each form set, although often not the top copy, is printed as the 'Original Freight Bill' or as the 'Original'. Even though a carbon

copy is not the top copy, it is the only copy which is considered the original freight bill for invoicing and collection purposes. Only one original freight bill is issued for each shipment . . . Usually each copy is printed in a different color for more accurate identification and handling of the particular copy desired . . . Carriers also use invoices or statements for billing their shipper-receivers, on which the freight bills are listed by pro number and amount, and which are sent to the shipper-receivers with the original freight bills and any additional copies required by the shipper-receivers . . . A few of the very smallest carriers, operating solely intrastate and not subject to ICC regulations . . . have used freight bills form sets in which none of the copies has a printed designation as the 'Original.' . . . . A freight bill ordinarily is not signed by the party obligated to pay it. In this respect freight bills are similar to drafts, which may be signed only by a drawer-obligee and not by a drawee-obligor."

in this action, freight bills do not constitute evidence, in themselves, of a right to the payment of money. The right to collect the indebtedness referred to in the freight bill is not transferred by delivery of the freight bill, with or without any indorsement or assignment. This material and fundamental operative fact is evidenced by the necessity, according to the evidence in this action, of any assignee's notifying the account debtor that payment should be made to the assignee and by the necessity of rendering such notice independently of the wording printed on the freight bill.[5] By reason of the fact that several copies of each freight bill are invariably produced with respect to each single shipment of goods, if possession of a freight bill alone were sufficient to give rise to the right to payment, then several persons could lawfully be claiming the right to payment of the freight charges at one and the same time.[6]

■ Essential to any document which can be regarded as falling within the Code's definition of "instrument," as quoted above, is that it be given some legal efficacy by means of signatures or their equivalents which would bind those who are obligated.[7] According to the evidence in this action, a freight bill does not create, secure, modify or terminate the right to payment of the freight charges. The right to payment for the freight charges exists independently of the bill. As observed above, the freight bill does not contain any legally binding indicia as it pertains to the right to collect freight charges. It is not the issuance of the memorandum which constitutes a freight bill, but the shipping and receiving of the goods, which provides the evidentiary basis for the payment.[8]

■ Because of the absence of these fundamental properties of an instrument, the court must conclude that the freight bills are not instruments within the meaning of the governing law. Accordingly, perfection of any security interest in any freight charges referred to by a freight bill need not be accomplished by possession as seemingly required in section 400.9–304(1), *supra*.

As contended by the plaintiff United Missouri Bank, the freight charges which came into existence as the result of shipments referred to in the freight bills can only be regarded as "accounts." See section 400.9–106 RSMo, providing that " 'account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." The freight charges are not evi-

---

5. Cf. Trustee's Proposed Findings of Fact and Conclusions of Law, p. 23, to the following effect:

"All freight bills purchased by TCM, after being sorted by shipper-receiver and listed on the billing statements prepared by TCM, were then microfilmed. As they came out of the microfilming machine, each freight bill and billing statement was stamped with a uniform assignment and indorsement stamp ... which provided:

SOLD & ASSIGNED TO
TRANSPORT CLEARING–MIDWEST, INC.
BOX 19516 K.C. MO. 64141
(DATE)
REMIT TO ABOVE."

6. In this respect, the trustee emphasizes in his briefs that only original bills were purchased by Transport Clearings-Midwest and that only the original was imprinted with a standard legend of assignment, see note 5, *supra*. But according to the evidence, multifarious forms of freight bills are produced by the various carriers, and it is hardly certain that an original would always be recognizable as such. Further, the decisive factors in determining whether a freight bill is an "instrument" are spelled out in the text of this memorandum.

7. On this point, the defendant trustee in bankruptcy argues to the contrary, contending that it is not unknown in the realm of commercial instruments for a document issued or signed only by an obligee to have a binding effect on an obligor. He cites a draft as an example of such a document. But a draft ordinarily has legal efficacy as an instrument only if it bears a sign or indicia of the obligor's granting of authority for its issuance.

8. In a suit brought for payment of a freight bill, it would be insufficient to prove the existence of the freight bill, without more. The fact of performance of the undertaking would additionally have to be proved.

denced by chattel paper or by instruments.[9] Consequently, perfection of the bank's security interest was sufficiently accomplished by the filing of financing statements.

In the opinion of this court, the factual and legal issues must be regarded as simple as the foregoing analysis. Although some evidence was necessary as to the general characteristics and use of a freight bill in order to make this determination, and the court could not therefore grant summary judgment in accordance with the bank's earlier motion therefor, the material issues, both factual and legal, have remained simple and clear as they relate to the issue of perfection. To find or hold otherwise would be to be at odds with the Uniform Commercial Code's central purposes of simplicity and clarity.

■ Nevertheless, both evidentiarily and legally, the parties have given the matter extended and quite expert treatment, with the result that the court, after an extended trial, has been obliged to parse the voluminous transcripts and briefs in order to assure fair consideration of all the contentions. This has been done with care and it necessarily has taken a great deal of time to accomplish review of all the contentions carefully. To eliminate unproductive time and effort, the court has ferreted out and distilled the material considerations set forth above. Otherwise, to ensure fair treatment of all the potentially material issues, the court has treated the trustee's other prominent legal contentions in the footnotes.[10]

### Validity and Scope of the Security Interests

■ As noted above, the defendant trustee in bankruptcy also contends that the security interest of the United Missouri Bank in "instruments for the payment of money evidencing Borrower's accounts" cannot be held to apply to the freight bills which are in part the subject matter of this action. It is contended in this regard by the trustee that "(t)here never were any 'Borrower's accounts' because TCM (the bankrupt organization) did not sell or lease any goods or render any services for shippers and receivers."

**9.** See section 400.9–105(1)(b): " 'Chattel paper' means a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods. When a transaction is evidenced both by such a security agreement or a lease and by an instrument or a series of instruments, the group of writings taken together constitutes chattel paper."

**10.** The defendant trustee in bankruptcy points out that it was the freight bills themselves, rather than the underlying accounts, which the bankrupt intended to purchase from the member carriers. But, if the matter purchased by the bankrupt is to be deemed to have any legal efficacy, it must necessarily be held that the "account" was purchased. As previously observed, see note 8, *supra,* the freight bill cannot have any meaning apart from the delivery of the shipment of freight.

It is further pointed out by the defendant trustee in bankruptcy that the freight bills which are the subject of this action are equated by regulations of the Interstate Commerce Commission with bills of lading, which are ordinarily conceived of as evidencing the undertaking of the carrier of goods who issues the document. See, e.g., Black's Law Dictionary, p. 210 (4th ed. 1968), defining "bill of lading" as "(a) written memorandum given by the person in command of a merchant vessel, acknowledg-

ing the receipt on board the ship of certain specified goods, in good order or 'apparent good order', which he undertakes, in consideration of the payment of freight, to deliver in like good order ... at a designated place to the consignee therein named or to his assigns ... The term is often applied to a similar receipt and undertaking given by a carrier of goods by land." The document is issued, executed or signed by the carrier and is therefore binding as to him. But the right to collection of the freight charge is to be regarded as an "account" of the carrier which is not evidenced by the issuance of the freight bill or bill of lading but by the independent fact of delivery of the freight.

The defendant also contends that the freight bill constitutes a writing having legal efficacy to prompt payment by a consignee or other receiver of·a freight shipment because both the regulations of Transport Clearings-Midwest and those of the Interstate Commerce Commission require that the original of the freight bill be delivered to a consignee or other receiver of the shipment as a prerequisite of payment. The use of the bill, appropriately marked, as a receipt for payment, however, does not give it the character of an instrument evidencing the right to payment.

Whatever the merit of this contention, the foregoing finding of the court that the collected freight charges are the proceeds of "accounts" rather than "instruments" obviates the necessity for its consideration by the court. And this is so for the additional reason that, if the freight bills are ultimately found by a reviewing court to be "instruments," then the plaintiff bank cannot be held to have perfected any security interest in them by means of filing of financing statements. Under the facts of this case, the unequivocal letter of section 400.9–304(1), *supra,* rules out such a possibility. One Missouri decision has held that "(a) security interest in an instrument, such as a certificate of deposit, may be perfected by the secured party's taking possession of the instrument or by filing a financing statement representing the transaction." *Washington Commercial Bank v. Bollwerk,* 582 S.W.2d 695, 700 (Mo.App.1979). But, in this case, in which the freight bills cannot be considered to "constitute part of chattel paper" within the meaning of section 400.9–304(1), *supra,* that authority must be held to be inapposite.[11]

Otherwise, the validity of the security interest of the plaintiff in "accounts" is not challenged. And, in accordance with the foregoing findings, it must be held that the security interest in "accounts" is of sufficient scope to cover the collected freight charges.

*Applicability of Bank's Security Interest in "Accounts" to "Chargebacks"*

██ The trustee in bankruptcy next contends that the plaintiff bank's security interest in "accounts," even if valid and perfected, cannot be interpreted as effecting a security interest in "chargebacks," i.e., charges which the bankrupt organization made against member carriers who had sold the bankrupt freight accounts which the

bankrupt organization, for various reasons, was unable to collect, for various reasons, such as payment having been made by mistake by the receiver of the shipment directly to the member carrier. The trustee contends that the "chargebacks" are "general intangibles" in which the plaintiff bank has no security interest. The "chargebacks," however, are based originally upon the right to collect the freight charges, which the member carrier has assigned to the bankrupt with some right of recourse in the event of inability of the bankrupt to collect the freight account. Such "chargebacks" thus arise and exist only with respect to freight accounts. They have no significance independent of those accounts and are ancillary to the right to collect those accounts. Thus, under the governing section of the Uniform Commercial Code, they are to be considered as within the security interest in "accounts." See the official comment to section 9–106 of the Code, which states as follows:

"A right to the payment of money is frequently buttressed by ancillary covenants to insure the preservation of collateral, such as covenants in a purchase agreement, note or mortgage requiring insurance on the collateral or forbidding removal of the collateral; or covenants to preserve credit-worthiness of the promisor, such as covenants restricting dividends, etc. While these miscellaneous ancillary rights might conceivably be thought to fall within the definition of 'general intangibles,' it is not the intention of the Code to treat them separately and require the perfection of assignment thereof in the manner required for perfection of an assignment of general intangibles. Whatever perfection is required for the perfection of an assignment of the right to the payment of money will also carry these ancillary rights.

11. As observed in note 9, *supra,* "chattel paper" is defined by the Code as evidencing a security interest or lease of *specific goods.* Accounts and instruments are expressly excluded from the Code's definition of "goods." See section 400.9–105(1)(f) RSMo. From the Code, it would appear that the only designation

other than "accounts" that a right to payment for the delivery of freight could be included under would be that or a "contract right" under section 400.9–106 RSMo with respect to uncollected freight charges. It would appear from the evidence that the bank's security interest in such would be both valid and perfected.

"Similarly, when the right to the payment of money is not yet earned by performance, there are frequently ancillary rights designed to assure that an assignee may complete the performance and crystallize the right to payment of money ... These ancillary rights, if considered in the abstract, might be thought to be 'general intangibles,' since they do not themselves involve the payment of money; but it is not the intent of the Code to split up the rights to the payment of money and its ancillary supports, and thereby multiply the problem of perfection of assignments. Therefore, all rights of the lessor in a lease are to be perfected as 'chattel paper,' and all rights of the owner in a ship charter are to be perfected as accounts."

In a similar manner, the "chargebacks" described in the evidence in the action at bar, are ancillary to the freight accounts and are therefore to be perfected in the same manner, i.e., by the filing of financing statements as to the "accounts."

### Applicability of the bank's security interest to "special assessments"

█ The trustee in bankruptcy finally contends that the plaintiff bank's security interest in "accounts" does not include "special assessments" which the bankrupt organization made against its member carriers for the purpose of defraying the costs of certain litigation.[12]  In this regard, based on the facts of this case, the trustee's contention must be sustained.  These "special assessments," made for a special purpose other than that of adding to the bankrupt's general revenues, cannot be regarded as "accounts."  They are not payment for good or services.[13]  If anything, they are general intangibles.  Accordingly, plaintiff's security interest does not cover them.

For the foregoing reasons, it is hereby

ADJUDGED that the security interest of the plaintiff United Missouri Bank of Kansas City, N.A. in collected freight charges

and the "chargebacks" which are ancillary thereto is valid, perfected, and enforceable, but that the security interest of the bank does not extend to "special assessments."

---

12. The evidence satisfactorily shows in this regard that the litigation which was being conducted was for the mutual benefit of the clearinghouse and its member carriers.

13. See section 400.9–106 RSMo.