# LABOR READY NORTHEAST, INC.

### v.

# Marilyn Shannon McCONAGHY, in Her Capacity as Director of the Department of Business Regulation.

### No. 2002–698–M.P.

Supreme Court of Rhode Island.

June 4, 2004.

William M. Dolan, III, Esq., Providence, for Plaintiff.

Brian P. Stern, Esq., for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

FLANDERS, Justice.

As our parents used to tell us, "money doesn't grow on trees." But nowadays, for a fee, it sometimes comes out of machines.

In this case, an employer of temporary workers hired them out each day to per-

form various manual-labor jobs for the employer's customers. Pursuant to its "work today, cash today" policy, the employer equipped its branch offices with so-called cash-dispensing machines (CDMs) for these laborers to use, thereby affording them an optional means to convert their earned wages for each day's work into cash. In doing so, however, the employer charged these employees a fee. Indeed, Labor Ready, Inc., the employer's parent company, grossed over eight million dollars nationwide just for the year 2000 by providing this profit-making CDM service to its employees on a daily basis.[1]

Was the employer required to obtain a license to engage in this profitable activity because it was operating a check-cashing business in this jurisdiction? The Department of Business Regulation (DBR or the department) thought so, but the Superior Court disagreed, deeming a contrary DBR ruling on this issue to be clearly erroneous and unauthorized.

Because the Superior Court, we conclude, failed to accord the requisite deference to the DBR's administrative decision on this question, we respectfully disagree with the court's unduly narrow definition of the word "instrument," as the General Assembly used that term of art in the operative check-cashing statute. Consequently, because the employer in question improperly provided currency for checks without first obtaining a DBR license to do so, we reverse, quash the judgment of the Superior Court, and remand the papers in this case for the entry of a new judgment consistent with this opinion.

### Facts and Travel

The employer, Labor Ready Northeast, Inc. (Labor Ready), provided the above-described temporary day-labor services to its customers from its three branch offices in Rhode Island. Each morning, its employees would report to one of Labor Ready's branch offices. At the end of each work day, after finishing their assigned day-labor job for Labor Ready's customers, the employees would return to one of these branch offices to obtain payment for their services.

Labor Ready offered its workers two payment options for each day's work. Under one method, employees could choose to receive their daily wages via a traditional paycheck. If an employee opted for this payment method, Labor Ready arranged with a local national bank to permit these workers to cash their daily paychecks there without paying a fee. Alternatively, employees could elect to receive a cash payment for their daily wages at Labor Ready's branch offices via a voucher system that Labor Ready used to disburse these payments. Under this method, the employees could obtain cash equal to their earned wages (net of any tax deductions and other withholdings) at the end of each working day directly from Labor Ready, less a fee it charged them for using a CDM to dispense the cash.

An employee could take advantage of this second payment method by obtaining a written voucher from Labor Ready. Among other data, the voucher contained an access code comprising a series of numbers. Labor Ready had these access codes printed on the vouchers that it provided to its employees. Besides the access codes, these vouchers also contained other information, including the employee's

---

1. *Labor Ready, Inc., Form 10–K, 2000 Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934* 16 (2001). The 8.3 million dollars earned by Labor Ready, Inc., the parent company of Labor Ready Northeast, Inc., represents CDM fees collected from all of Labor Ready Inc.'s nationwide chain of dispatch offices.

name and address and certain tax-withholding information.

To obtain a cash payment for the wages due to them, the employees manually would punch the access-code numbers into one of Labor Ready's CDMs inside its branch offices.[2] Labor Ready also charged a fee to those workers who chose to receive cash for their wages via this voucher system. This fee was equal to one dollar, plus the so-called "breakage," which was the amount of change included in the employee's net earned wages. For example, if an employee wished to use the voucher system to convert $51.25 in net wages that he or she had earned for that particular day's work into cash, the employee could punch in the access code to the CDM and the CDM would disburse $50 to the employee ($51.25, less the fee— $1 plus $0.25—that Labor Ready charged the employee to use this method of obtaining payment).

On August 9, 2001, DBR caused Labor Ready to be served with an order to show cause and a notice of hearing, alleging that its voucher system constituted an unlicensed check-cashing business in violation of G.L.1956 § 19–14–2.[3] After an administrative hearing on March 20, 2002, the hearing officer found that, by using CDMs to dispense cash to its employees, Labor Ready was engaged in the unlicensed business of check cashing in violation § 19–14–2. Thereafter, DBR, through its director, adopted the hearing officer's recommendation and issued a decision ordering Labor

Ready to cease and desist from using this voucher CDM system to pay cash to its employees without first obtaining a license to do so.

Pursuant to G.L.1956 § 42–35–15, Labor Ready timely appealed this administrative decision to the Superior Court, where it sought a stay of the DBR's decision pending its appeal. Although the court initially denied Labor Ready's stay request, it ultimately agreed with Labor Ready's argument that DBR had exceeded its statutory authority by applying the check-cashing statute to its voucher system. Consequently, the Superior Court reversed the DBR's administrative decision on this question. The reviewing justice ruled that DBR failed to properly interpret the word "instrument" as that term is used in § 19–14–1. Seeking our review of this judgment, DBR petitioned this Court for a writ of certiorari, which we issued on May 29, 2003.

In its brief to this Court, DBR argues that the Superior Court erred in reversing its administrative decision applying the check-cashing laws to Labor Ready's voucher system. It contends that courts reviewing administrative decisions such as this one should accord great deference to the administrative agency charged with administering and interpreting the regulatory statute in question. The Superior Court failed to accord its decision such deference, DBR maintains, by interpreting the statute in such a narrow manner that

---

**2.** Labor Ready leased these machines from a third party.

**3.** General Laws 1956 § 19–14–2 provides:
"No person shall engage within this state in the business of: (1) making or funding loans or acting as a lender or small loan lender; (2) brokering loans or acting as a loan broker; (3) selling checks for a fee or other consideration; (4) *cashing checks for a fee or other consideration which includes*

*any premium charged for the sale of goods in excess of the cash price of the goods;* or (5) providing electronic money transfers for a fee or other consideration without first obtaining a license from the director or the director's designee. Special exemptions from licensing for each activity are contained in other chapters in this title." (Emphasis added.)

it unduly restricted the definition of a "check"—as that term is used in § 19–14–1—to just "negotiable instruments,"[4] when the term "check," as used in the check-cashing statute, has a much broader application. Finally, the department suggests, even if we excluded Labor Ready's vouchers from the scope of § 19–14–1, its voucher system, under which workers must pay a small fee to obtain cash wages from the CDM, violated G.L.1956 § 28–14–2, which requires employers to pay wages in full to their employees.

Labor Ready, on the other hand, argues that we should affirm the Superior Court judgment reversing DBR because its administrative decision on this point was clearly erroneous. According to Labor Ready, the administrative hearing officer disregarded the proper definition of the undefined statutory term "instrument" in determining that Labor Ready's vouchers fell within the definition of what constitutes a "check" under § 19–14–1. Instead, Labor Ready posits, the reviewing justice properly concluded that its vouchers did not constitute "checks" under § 19–14–1 because these vouchers were not negotiable instruments, did not show evidence of or define any right to payment, and were not delivered to or transferred in any way to Labor Ready in exchange for currency. Further, Labor Ready contends, even if we determined that its vouchers qualified as "checks" for the purposes of § 19–14–1, its voucher system still did not constitute a check-cashing business because the statutory word "for" contemplates a physical tender or delivery of the instrument in question in exchange for a cash payment, which, Labor Ready says, does not occur under this voucher system. Finally, Labor Ready suggests that DBR is not the proper authority to enforce alleged violations of § 28–14–2.

For the reasons negotiated below, we reverse, quash the judgment of the Superior Court, and remand this case to it for the entry of a new judgment affirming DBR's decision that Labor Ready's voucher system constituted an unlicensed check-cashing business under § 19–14–2.

## Analysis

■ This Court reviews Superior Court judgments interpreting statutes on a *de novo* basis. *Stebbins v. Wells*, 818 A.2d 711, 715 (R.I.2003) (per curiam). In doing so, our "ultimate goal is to give effect to the purpose of the act as intended by the Legislature." *Id.* (quoting *Mottola v. Cirello*, 789 A.2d 421, 423 (R.I.2002)). Nevertheless, when an administrative agency interprets a regulatory statute that the General Assembly empowered the agency to enforce, a court reviewing the agency's interpretation of the statute as applied to a particular factual situation must accord that interpretation "weight and deference as long as that construction is not clearly erroneous or unauthorized." *In re Lallo*,

4. General Laws 1956 § 6A–3–104(a) defines a "negotiable instrument" as follows:
" '[N]egotiable instrument' means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:
(1) Is payable to bearer or to order at the time it is issued or first comes into possession of a holder;
(2) Is payable on demand or at a definite time; and
(3) Does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the promise or order may contain (i) an undertaking or power to give, maintain, or protect collateral to secure payment, (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral, or (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor."

768 A.2d 921, 926 (R.I.2001) (quoting *Gallison v. Bristol School Committee*, 493 A.2d 164, 166 (R.I.1985)). To be sure, when the language of the statute is clear and unambiguous, the court must interpret it literally, giving the words of the statute their plain and ordinary meanings. *Stebbins*, 818 A.2d at 715. And "[a]n agency cannot modify the statutory provisions under which it acquired power, unless such an intent is clearly expressed in the statute." *Little v. Conflict of Interest Commission*, 121 R.I. 232, 236, 397 A.2d 884, 886 (1979). But when "the provisions of a statute are unclear or subject to more than one reasonable interpretation, the construction given by the agency charged with its enforcement is entitled to weight and deference as long as that construction is not clearly erroneous or unauthorized" *In re Lallo*, 768 A.2d at 926 (quoting *Gallison*, 493 A.2d at 166). This is true even when other reasonable constructions of the statute are possible. *Pawtucket Power Associates Limited Partnership v. City of Pawtucket*, 622 A.2d 452, 456–57 (R.I.1993) "( [D]eference will be accorded to an administrative agency when it interprets a statute whose administration and enforcement have been entrusted to the agency * * * even when the agency's interpretation is not the only permissible interpretation that could be applied.").

Here, applying a *de novo* standard of review, we hold that the reviewing justice erred in concluding that Labor Ready's vouchers were not a type of "other instrument for the transmission or payment of money" within the meaning of that phrase as it is used in § 19–14–1. Section 19–14–1(1) provides:

" 'Check' means any check, draft, money order, personal money order, or *other instrument for the transmission or payment of money*. For the purposes of check cashing, travelers checks or foreign denomination instruments shall not

be considered checks. *'Check cashing' means providing currency for checks*." (Emphases added.)

Both parties agree that Labor Ready's vouchers were not conventional checks, drafts, money orders, or personal money orders. Hence, the only issue before us is whether the DBR reasonably could decide that Labor Ready's vouchers were "other instrument[s] for the transmission or payment of money." As the agency responsible for enforcing this statute, DBR construed it to be such an "instrument." Because this interpretation was not clearly erroneous or unauthorized, it was entitled to weight and deference by a reviewing court.

In this case, however, the Superior Court failed to give the DBR's reasonable construction of this statute the deference it was due. As a result, we reverse and hold that the Superior Court should have upheld the DBR's conclusion that these vouchers were a type of "instrument for the transmission or payment of money" under § 19–14–1 and that Labor Ready was engaging in an unlicensed check-cashing business.

## I

## The Decision of the Superior Court Failed to Give the DBR's Interpretation of Its Regulatory Statute the Requisite Deference

Initially, we hold that the Superior Court justice who reviewed this DBR decision improperly overrode the department's right to interpret this ambiguous regulatory statute by not deferring to the agency's interpretation of the term "instrument," as the General Assembly used that term in § 19–14–1. Because the General Assembly did not define the term "instrument" in the check-cashing statute and because it was subject to more than one reasonable

interpretation—we quote at least four possible definitions below—the Superior Court should have found that this term was ambiguous. As indicated previously, "when the statute 'is silent or ambiguous' we must defer to a reasonable construction by the agency charged with its implementation." *Barnhart v. Thomas,* — U.S. —, —, 124 S.Ct. 376, 380, 157 L.Ed.2d 333 (2003) (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *In re Lallo,* 768 A.2d at 926.

■ The trial justice, therefore, should not have reversed the administrative decision interpreting this ambiguous regulatory statute because that decision was not clearly erroneous or unauthorized. *See In re Lallo,* 768 A.2d at 926. Although the agency could have reasonably interpreted the term "instrument" in a narrower manner, as the Superior Court did, DBR chose another reasonable interpretation of this undefined term, construing it broadly to encompass all written legal documents defining or evidencing a right to payment, regardless of their negotiability. Far from being erroneous or unauthorized, this decision simply adopted one of several extant definitions or interpretations of the undefined statutory term "instrument" and reasonably applied it to this factual situation. Thus, even though the reviewing justice disagreed with the agency's conclusion because he would have preferred a narrower definition of this undefined statutory term (namely, the one set forth in Article 3 of the Uniform Commercial Code (U.C.C.) pertaining to negotiable instruments) than the one that DBR chose to apply, he was not free to reverse that administrative decision because it was not clearly erroneous or unauthorized.

## II

**According to the DBR's Definition, The Term "Instrument" as Used in § 19–14–1 Broadly Refers to Any Written Document That Defines Legal Rights, Duties, Entitlements, or Liabilities**

Not only did the reviewing justice improperly override the DBR's right to interpret an ambiguous regulatory statute that the General Assembly empowered this department to administer and enforce, but also he read § 19–14–1 too narrowly by construing the term "instrument" to include only "negotiable" instruments or documents specifying a right to payment that are transferred and delivered in exchange for the payment of cash.

■ The Rhode Island General Laws do not define the term "instrument" for purposes of § 19–14–1. Thus, both the DBR and the Superior Court looked to external sources, such as the Uniform Commercial Code and Black's Law Dictionary, to determine how such sources define the term "instrument." Not surprisingly, § 104 of U.C.C. Article 3, pertaining to "Negotiable Instruments," and codified in this state as G.L.1956 § 6A–3–104(b), provides: " 'Instrument' means a negotiable instrument." Section 102 of U.C.C. Article 9, pertaining to "Secured Transactions," and codified at G.L.1956 § 6A–9–102(47), however, defines an "instrument" more broadly, saying that it "means a negotiable instrument *or any other writing that evidences a right to the payment of a monetary obligation * * * and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment.*" (Emphasis added.) But a recent edition of Black's Law Dictionary defines "instrument" in still broader terms, dropping any requirement of negotiability or transfer by delivery:

"*A written legal document that defines rights, duties, entitlements, or liabilities,* such as a contract, will, promissory note, or share certificate. 2. *Commercial law.* An unconditional promise or order to pay a fixed amount of money, with or without interest or other fixed charges described in the promise or order." Black's Law Dictionary 801–02 (7th ed.1999). (Emphasis added.)

The department effectively adopted the first Black's Law definition quoted above in deciding that the term "instrument," as used in § 19–14–1, broadly refers to any written legal document that defines rights, duties, entitlements, or liabilities, thereby including Labor Ready's vouchers.[5] This interpretation is consonant with the DBR hearing officer's decision, finding that the term "instrument" applied to more types of legally significant documents than just conventional checks, drafts, and money orders.

In addition, the inclusion of contracts and wills in the above-quoted Black's Law definition of the word "instrument" also is telling for our purposes. Just as a contract or a will need not be delivered or transferred for that document to qualify as an "instrument" under the above-quoted definition of that word in Black's Law Dictionary, we hold that DBR was not clearly wrong in deciding that the absence of any required transfer, delivery, endorsement, or exchange of a Labor Ready voucher before an employee could obtain cash from

the CDM machine did not disqualify such vouchers from constituting an "instrument" under § 19–14–1.

Therefore, we disagree with Labor Ready's contention that the Superior Court correctly construed the term "instrument" as meaning only a "negotiable instrument." The reviewing justice held, in part, that "[t]he plain meaning of the term 'instrument' [as used in § 19–14–1(1)] is a 'negotiable instrument.'" He concluded that Labor Ready's voucher was "not a negotiable instrument, and if it is not a negotiable instrument it cannot be a check under § 19–14–1." But if the General Assembly had intended the check-cashing statute to apply only to "negotiable instruments," it easily could have and would have said as much by defining that term narrowly within the text of § 19–14–1, just as it did when it narrowly defined "instrument" in § 6A–3–104. But it failed to include such a constricted definition of the term in the check-cashing statute.

In addition, the check-cashing statutes of other states expressly provide that they apply to both negotiable and nonnegotiable instruments. *See, e.g.,* Ariz.Rev.Stat. § 6–1201(13) (2004); Fla. Stat. Ann. § 560.103(15) (2004); Tenn.Code Ann. § 45–18–102(11) (2003). The Arizona provision, for example, is similar to our statute and provides that " '[c]heck cashing' means exchanging for compensation a check * * * or payment instrument."

---

**5.** Both the DBR and the Superior Court also referred to the multiple definitions of "instrument" as found in the fifth edition of Black's Law Dictionary, published in 1979. This earlier version defined "instrument" variously as:

"*A written document; a formal or legal document in writing, such as a contract, deed, will, bond, or lease.* A negotiable instrument (defined in U.C.C. § 3–104), or a security (defined in U.C.C. § 8–102) or any other writing which evidences a right to the

payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." Black's Law Dictionary 719–20 (5th ed.1979). (Emphasis added.) Although DBR relied on the underscored first portion of this definition, the slight definitional variations between this version and the 1999 definition in the Black's Law Dictionary are not material for the purpose of deciding this case.

Ariz.Rev.Stat. § 6–1201(2). The statute goes on to define a payment instrument as "a check, draft, money order * * * *or other instrument* * * * for the transmission or payment of money* * * * whether or not that instrument or order is negotiable."* Ariz.Rev.Stat. § 6–1201(13). (Emphasis added.) Although, these differently-worded statutes from other states do not control the outcome of this case, they demonstrate that there is no compelling support for Labor Ready's contention that a reviewing court necessarily must interpret the term "instrument" as referring only to "negotiable instruments." The undeniable fact is that other legitimate definitions of "instrument" exist that do not require the document in question to be "negotiable" to qualify as an "instrument."

Finally, arbitrarily limiting the definition of the term "instrument" to just "negotiable instruments" is particularly unsound when the other documents that § 19–14–1 provides as examples of an "instrument" may be either negotiable or nonnegotiable. For example, a money order—one of the examples preceding the "or other instrument" language in the statute—can be either negotiable or nonnegotiable. *Cf. Aetna Casualty & Surety Co. v. Schmitt,* 441 F.Supp. 440, 445 n. 10 (D.Cal.1977) ("A money order may be either a negotiable or a non-negotiable instrument."). Therefore, given the enforcing agency's adoption of a broader but reasonable definition than the one championed by Labor Ready, a reviewing court should not have construed the term "instrument" narrowly as referring only to negotiable instruments, especially when § 19–14–1 expressly includes other legal documents within the definition of the term "check" that need not be negotiable.

Labor Ready next argues that even if § 19–14–1 applies to both negotiable and nonnegotiable instruments, its vouchers still do not qualify as "instruments" under § 19–14–1 because other courts have held that the mere fact that a document contains legally significant information does not necessarily qualify it as an "instrument" for the purpose of U.C.C. Article 9. *See In re Newman v. West Loop Savings Association,* 993 F.2d 90, 95 (5th Cir.1993) (holding annuity contract was "general intangible" rather than "instrument" for Article 9 purposes); *In re Holiday Intervals, Inc. v. Brown,* 931 F.2d 500, 503 (8th Cir.1991) (holding land-sale contracts were not "instruments" for Article 9 purposes); *In re Transport Clearings–Midwest, Inc. v. Small,* 26 B.R. 282, 286 (Bankr.Mo.1982) (holding freight bills were not instruments for Article 9 purposes). These cases, however, are inapposite to this situation because whether a document qualifies as an "instrument" for the purpose of analyzing secured-transactions under U.C.C. Article 9, or whether it can pass muster as a "negotiable instrument" under U.C.C. Article 3, does not determine whether it qualifies as an "instrument" under § 19–14–1, the check-cashing statute. As Articles 3 and 9 of the U.C.C. themselves demonstrate, the term "instrument" has been defined differently for different purposes in different statutes.

■ Labor Ready also argues that its vouchers cannot qualify as "other instruments" under § 19–14–1 because it is the access code, not the voucher itself, that constitutes the right to payment. According to Labor Ready, any person having knowledge of the access code can obtain currency from a CDM. Thus, says Labor Ready, it is the transmittal of the numeric information contained on the voucher—not the voucher itself—that allows the employee to obtain currency from the CDM.

Nevertheless, the vouchers containing the access codes still provided evidence of and defined each employee's right to obtain the cash payments in question. More-

over, it was still the vouchers themselves—and not some other form of communication—that provided Labor Ready's employees with the means to obtain the cash payments due to them because it was the vouchers that transmitted the access-code information to the employees, which in turn then enabled them to obtain currency upon transmitting the vouchers' access codes into the CDM. Although we agree with Labor Ready that any person having knowledge of a given voucher's access code could obtain the cash due to the employee from the CDM, the employees controlled the vouchers. And it was the vouchers that not only defined but also evidenced the employees' entitlement to receive a cash payment from their employer in the net amount shown on the vouchers, upon the insertion of each voucher's access code into the CDM.

Moreover, it would be difficult to conclude that Labor Ready's vouchers did not define or evidence the employees' right to receive payment of the net amount shown on the vouchers, less the fee charged by Labor Ready for providing this service. Consider what would happen if Labor Ready incorrectly programmed the CDM so that it improperly rejected a particular voucher's access code. Would not that voucher still be evidence of the employee's right to obtain currency for the net amount shown on the voucher? Although we concede that the voucher does not evidence a right to payment in the Article 3 sense—that is, a worker could not negotiate the voucher to a transferee—we nevertheless conclude that DBR was not clearly wrong in finding that Labor Ready's vouchers still define and constitute evidence of their employees' right to obtain

cash payments in the context of the check-cashing statute and that, therefore, they qualify as an "instrument" under that law.

## III

### Labor Ready's Voucher System Constituted "Check Cashing" Under § 19–14–1

■ In addition to holding that DBR was entitled to find that Labor Ready's vouchers qualified as a type of "instrument" under § 19–14–1, we also conclude that DBR acted within its authority in determining that Labor Ready improperly engaged in an unlicensed check-cashing business in violation of § 19–14–2 when it provided currency to its employees "for" checks.

The plain language of § 19–14–1(1) says that: " 'Check cashing' means providing currency for checks." Here, Labor Ready provided currency to those employees who used the numeric information contained on the vouchers to obtain payment for their labor through its CDMs. In that way, Labor Ready was providing "currency for checks."

We disagree with Labor Ready's contention that its voucher system could not constitute a check-cashing business because the statutory word "for" necessarily contemplates a physical tender or delivery of the instrument in question to the payor in exchange for a cash payment. Citing language from the Superior Court decision in this case,[6] Labor Ready suggests that its voucher system did not violate § 19–14–2 because it never took possession of the vouchers from the employee and because

---

6. Having found that Labor Ready's vouchers were not "instruments," the trial justice said: "Even assuming *arguendo* that Labor Ready's voucher is a 'check' for the purposes of § 19–14–1, Labor Ready does not

provide currency 'for' a check because (1) Labor Ready never takes possession of the voucher; and (2) Labor Ready provides currency instead of a check, and not *for* the voucher. There is no transfer whatsoever."

its workers did not exchange or transfer their vouchers "for" the cash they received from the CDM. Rather, the workers needed only to enter their access code into the CDM to obtain the currency due to them; they were not required to physically exchange their vouchers "for" the currency.

We are not persuaded, however, that the General Assembly's use of the word "for" necessarily requires a strict physical exchange between cash on the one hand and the voucher or instrument on the other in order for the activity in question to qualify as "providing currency for checks." Section 19–14–1(1) simply defines check cashing as "providing currency for checks." It does not require that a physical exchange occur in which a depositor exchanges, delivers, hands over, endorses, transfers, or relinquishes physical possession of the instrument in return for receiving currency. Just as the General Assembly could have easily defined the term "instrument" as a "negotiable instrument," the General Assembly also could have said that check cashing requires a physical tender of the instrument itself in exchange for the receipt of currency. But it did not do so. Rather, the undefined statutory word "for," in this context, simply means "as regards" or "in respect to," or "in view of," rather than necessarily requiring any physical tender or exchange of the instrument in question for the currency. *See* Webster's Third New International Dictionary 886 (1993) (listing these definitions, among others, for the word "for"). Therefore, based on the relatively spare and undefined general language of the statute, we are not inclined to place a limiting construction on the phase "providing currency for checks" when the General Assembly declined to include such express limitations in the statutory language it selected when enacting this law.

In addition, the doctrine of *noscitur a sociis* supports DBR's conclusion that Labor Ready's check cashing system violated § 19–14–2. "Under the doctrine of '*noscitur a sociis*,' the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it." *State v. Dearmas*, 841 A.2d 659, 667 (R.I.2004) (quoting *Wigginton v. Centracchio*, 787 A.2d 1151, 1155 (R.I.2001)). "The phrase *noscitur a sociis* translates literally from the Latin as 'it is known by its associates.'" *Id.* (quoting *Allstate Insurance Co. v. Russo*, 641 A.2d 1304, 1307 (R.I.1994)).

The doctrine of *noscitur a sociis*, therefore, helps us to ascertain the meaning of the phrase "check cashing" by looking to the other types of activities prohibited by the statute. Here, § 19–14–2 not only prohibits unlicensed check cashing, but it also imposes a license requirement on making or financing loans, brokering loans, selling checks, or providing electronic-money transfers. All these prohibited actions share one common element: they are all functions that typically are performed by banks or by other types of commercial financial institutions. Indeed, title 19 of the General Laws is entitled "Financial Institutions" and chapter 14 thereof is entitled "Licensed Activities." Hence, we are of the opinion that the General Assembly intended § 19–14–2 to prohibit employers such as Labor Ready from engaging in unlicensed banking or financial activities of the type that are at issue in this case. We also believe that Labor Ready's voucher system is an example of this type of unlicensed check cashing because Labor Ready engages in a profit-making activity when it charges its workers a fee to provide them with currency. Therefore, applying the doctrine of *noscitur a sociis* to interpret the phrase "check cashing," we hold that the DBR properly found that

Labor Ready's profitable voucher system actually constituted an unlicensed check-cashing business in violation of § 19–14–2.

The bottom line in this case is that Labor Ready, for a fee, provided cash to those persons who punched in the correct access-code numbers shown on the vouchers. The CDMs disbursed this money to Labor Ready's employees, who were entitled to receive this payment, as defined and specified by the information set forth in the vouchers that Labor Ready provided to its employees. Accordingly, we hold that DBR did not err in finding that Labor Ready improperly engaged in the unlicensed business of "providing currency for checks" under § 19–14–1(1) and § 19–14–2.

### Conclusion

Because Labor Ready's vouchers constituted checks under § 19–14–1 and because Labor Ready improperly engaged in an unlicensed check-cashing business in violation of § 19–14–2, we need not address the department's remaining arguments that Labor Ready's voucher system violated public-policy considerations or that it ran afoul of § 28–14–2's requirement that "wages shall be paid in full."

Therefore, we reverse, quash the judgment of the Superior Court, and remand the case for further proceedings consistent with this opinion. In doing so, we specifically direct the Superior Court to enter a new judgment upholding the DBR decision in question and decreeing not only that Labor Ready's vouchers constituted checks under § 19–14–1 but also that Labor Ready engaged in an unlicensed check-cashing business in contravention of § 19–14–2.