DECISION
Before this Court is an appeal of a decision by the Board of Examiners of Electricians ("Board"). The Rhode Island Department of Labor and Training ("DLT"), through its Director, Adelita S. Orefice ("Director"), cited the plaintiffs — Northeast Lightning Protection Systems ("Northeast") and its employees, Joel Barnes and Alan Barnes — for performing electrical work without the required licensing, and the Board affirmed the violations. The plaintiffs now ask this Court to vacate and reverse the Board's decision. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 FACTS AND TRAVEL
Northeast is a Connecticut corporation that manufactures and installs lightning protection equipment in a number of states, including Rhode Island. (May 18, 2005 Hearing Tr. at 28.) Approximately 90% to 95% of Northeast's projects are subcontracted from electrical subcontractors. Id. at 29. Generally, Northeast's jobs involve three phases in order to facilitate installation of the protective apparatus: first, placing of ground electrodes, then installing through-roof units, and, finally, inserting the direct-strike lightning protective system on the roof. Id. at 30-31. All of this work must comply with standards set forth in the National Fire Protection Association Code 780, Underwriter's Laboratories, Inc. Code 96A, and the Lightning Protection Institute Code 175. Id. at 30, 31, 37 (see also Northeast, http://www.northeastlightning.com) (detailing the corporations capabilities and parameters in which it must operate its business). Northeast does business in all of New England, California, New Jersey, and New York and — until now — has not been required to obtain an electric license in any of these jurisdictions. Id. at 28. It is not required to obtain such a license because the installation of lightning protection systems does not involve "wires, conduits, apparatus, fixtures and other appliances for carrying or using electricity for light, heat, or power purposes." Id. at 28, 32. In the event it becomes apparent that such electrical work will be required to complete any given project, it is Northeast's established policy to defer that work to properly licensed electricians — typically the electrical subcontractor which hired Northeast in the first place. Id. at 34.
On July 17, 2003, Northeast contracted with E.W. Audet Sons, Inc. ("Audet") — a licensed electrical contractor — to install a "complete system of lightning protection" in the Emergency Department at the Bridge Building of Rhode Island Hospital ("project").[1] The contract between Northeast and Audet provides the following: that the system be installed in accordance with the relevant provisions of Underwriter's Laboratories, the Lightning Protection Institute, and the National Electric Code; that the system be in copper and aluminum; that sufficient grounding be placed pursuant to the appropriate Codes; and that certain work — including that having to do with conduits and surge protection — must be done by "others" and not by Northeast. (July 17, 2003 Contract.)
On March 17, 2005, soon after commencement of the project, the Chief Electrical Engineer of the DLT ("Chief") entered the vicinity and issued three notices of violation. The first notice cited James Barnard, in his capacity as Executive Vice President of Northeast ("Barnard"), for violating G.L. 1956 § 5-6-2, which provides the following:
 "No person, firm, or corporation shall enter into, engage in, solicit, advertise, bid for, or work at the business of installing wires, conduits, apparatus, fixtures, electrical signs, and other appliances for carrying or using electricity for light, heat, fire alarms . . . or power purposes . . . unless that person, firm, or corporation shall have received a license and a certificate for the business, issued by the state board of examiners of electricians of the division of professional regulation of the department of labor and training." Section 5-6-2.
Northeast's citation also noted a violation of § 5-6-25, which mandates those doing electrical work to conduct their operations in "[c]ompliance with rules and requirements of [the] city."
In addition, the Chief delivered citations to Alan Barnes and Joel Barnes, the two Northeast employees working on the project at that time. These notices of violation stated that the employees had "performed electrical work in Rhode Island without Rhode Island electrical license" and again referenced § 5-6-2 as the statutory source from which the violation stemmed. (March 17, 2005 Notices of Violation.)
On the following day, March 18, 2005, the Assistant Director of the DLT ("Assistant Director") issued cease and desist orders at the recommendation of the Chief. The cease and desist order relative to Barnard specified that he had contracted to perform electrical work without a Rhode Island contractor's license or a city of Providence permit and, furthermore, that he had two unlicensed employees performing electrical work without the proper licenses. (See March 18, 2005 Order.) These violations, according to the order, were in contravention of §§ 5-6-2,5-6-25, and 5-6-32, and, consequently, Northeast was ordered to immediately cease and desist work on the project, and it was given the choice of either paying a fine of $2,000 or appealing the Assistant Director's findings.[2]
Likewise, the Assistant Director issued cease and desist orders pertaining to Alan Barnes and Joel Barnes, who, per the orders, were performing electrical work without the proper state licenses in violation of §§ 5-6-2 and 5-6-32. (See March 18, 2005 Orders.) As with Northeast, Alan Barnes and Joel Barnes were ordered to cease and desist their participation on the project and either pay a $500 fine or appeal to the Board. Id.
Northeast, on behalf of itself and its employees, appealed to the Board which held a hearing on the matter that same day. The plaintiffs presented one witness, Barnard, who testified that the work being conducted by Northeast at the project site — installing a lightning protection system — was not at all electrical. (May 18, 2005 Hearing Tr. at 48.)
The plaintiffs introduced into evidence an article defining "lightning" as follows:
 A cloud-to-ground thunderbolt begins with a discharge of free electrons at the base of a cloud, which are drawn down toward the electron-deficient (positive) ground. The negative step leader stroke of freed electrons zig-zags downward in steps. As the stepped leader nears ground, positive point streamer currents flow upward. . . . When the leader is about one step distance (approximately 150 feet or more), a positive streamer of point-discharge current rushes to meet it, completing an ionized path to the ground. Instantly, a positive return stroke rises along the channel at a speed of from one-half to one-tenth the speed of light. As this connection is made, an upward flash is created." Marian Perkowski, Lightning Protection Technology: A Study in Design, Installation and Maintenance, Electrical Contracting Engineering News (April 2000) at 38.
Barnard testified that the point of the protective system is to "intercept a strike of lightning and terminate it at the ground harmlessly." (May 18, 2005 Hearing Tr. at 32.) Barnard stressed that Northeast's work simply did not encompass "the performing or installing of wires, conduits, apparatus, fixtures, and other appliances for carrying or using electricity for light, heat, or power purposes." Id. at 32.
Rather, he stated, manufacturing and installing lightning protection systems is a unique discipline which has its own regulatory schemes separate from those policing electrical work.Id. at 26. In this light, Barnard testified, although much of the apparatus used by companies such as his is similar to that used by electric companies, there are intrinsic differences which make the lightning protection industry distinct from the electric.[3] Therefore, Barnard surmised, an electrician cannot use these materials, "[h]e's simply not certified to. He's not trained to do it." Id. at 55. Finally, Barnard reiterated that those in the lightning protection field, such as Northeast, typically work side by side with electric companies and defer work that is potentially electrical in nature when it arises to those with proper certifications.[4]
The Board also admitted into evidence two correspondences, both submitted to the DLT on the plaintiffs' behalf. The first of these letters is from Audet, who notes that it has been doing business with Northeast for approximately thirty years and that "lightning protection has always been and should always be installed by trained lightning protection installers such as [Northeast] employees." (May 1, 2005 Letter from Audet to the DLT.) Audet also indicates support for the notion that lightning protection installation is distinct from electric work. Id. The second correspondence is from another area electric company which has done business with Northeast and emphasizes that electrical contractors "prefer to use the more experienced, better trained Northeast rather than install the systems [it]self." (May 11, 2005 Letter from Commercial Electric to the DLT.)
The defendant then called Robert Zuba, Electrical Inspector for the cities of Warwick and Central Falls ("Zuba"). Zuba told the Board that the inspection of lightning protection systems is, in his opinion, within the scope of his job description as Electrical Inspector. (May 18, 2005 Hearing Tr. at 58.) Furthermore, it was his opinion that such construction requires an electrical permit because "they installed conduits on the conductors; and . . . the conductors they use carry voltage when there is a lightning strike. It can be measured in voltage and amperage." Id. Zuba did acknowledge, however, that he had no jurisdiction over projects in the city of Providence, and that he had no knowledge as to whether the city of Providence Inspector had issued any violations to Northeast or Audet in this instance.[5] He also admitted that the language of §§ 5-6-1
and 5-6-2 did not specifically mention lightning or lightning protection contractors. Id. at 70.
At the conclusion of the hearing, the Board found Northeast and its two employees to be in violation of §§ 5-6-2 and 5-6-25 and recommended to the Director the issuance of the statutorily mandated administrative penalties.[6] The Director then issued her decisions, upholding the imposition of each of the cease and desist orders while slightly altering the Board's penal recommendations.[7] On June 21, 2005, the plaintiffs made a timely appeal to this Court.
 STANDARD OF REVIEW
This appeal is from a decision made by an administrative agency, and, as such, the standard implemented by this Court is set forth in G.L. 1956 § 42-35-15, which provides the following:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When this Court reviews administrative decisions, it must review the record to determine whether the decision was predicated upon "legally competent evidence" Envl. Scientific Corp. v. Durfee,621 A.2d, 200, 208 (R.I. 1993) (citing Barrington Sch. Comm. v.Rhode Island State Labor Relations Bd., 608 A.2d 1126, 1138
(R.I. 1992)) and, further, "whether the decision was otherwise occasioned by error of law." Tierney v. Dep't of Human Servs.,793 A.2d 210, 213 (R.I. 2002) (citing Star Enterprises v.DelBarone, 746 A.2d 692, 695 (R.I. 2000)). Competent or substantial evidence is that which a reasonable mind might accept to support a conclusion. Caswell v. George Sherman Sand GravelCo., 424 A.2d 646, 647 (R.I. 1981).
This Court must afford deference to an administrative agency's interpretation of its enabling legislation. See Labor ReadyNe., Inc. v. McConaghy, 849 A.2d 340, 344-45 (R.I. 2004) (quoting In re Lallo, 768 A.2d 921, 926 (R.I. 2001) (citation omitted)). However, when the Court finds that the agency's interpretation erroneously alters the statutory provisions, the Court may then disregard that interpretation and apply that which it deems reasonable. Id. (quoting Little v. Conflict ofInterest Comm'n, 121 R.I. 232, 236, 397 A.2d 884, 886 (1979)). Therefore, when an "agency's interpretation goes beyond the limits of what is ambiguous and contradicts what in [this Court's] view is quite clear," the Court can then overturn the agency's decision. See Whitman v. Am. Trucking Ass'n, Inc.,531 U.S. 457, 481 (2001).
 STATUTORY INTERPRETATION
The plaintiffs claim that substantial rights have been prejudiced because the Board's decision violated statutory provisions by adopting an unreasonable interpretation of §§ 5-6-1
and 5-6-2. Specifically, Northeast avers that the evidence before the Board tends to show that the process of installing lightning protective systems falls outside the purview of § 5-6-1 etseq. and that Northeast's employees are not "electrical contractors" as the statute intends. Consequently, the plaintiffs maintain that the Board's decision to apply the licensing requirements in this instance was in violation of its enabling legislation and, therefore, in contravention of §42-35-15.[8]
Title 5, chapter 6 of the Rhode Island General Laws concerns the issuance of certificates and licenses for electricians. See
§ 5-6-1 et seq. Section 1 of that title and chapter defines an "electrical contractor" as "a corporation, firm or person, who, by the employment of journeypersons, performs the work of installing wires, conduits, apparatus, fixtures, and other appliances for carrying or using electricity for light, heat or power purposes." This section also specifically sets forth which type of worker the statute reaches, including electrical sign contractors, electrical sign installers, fire alarm contractors, fire alarm installation and installers, journeyperson electricians, and oil burner contractors. See § 5-6-1.
The subsequent section, entitled "Work for which license required," reinforces the focal point of the General Assembly's policy concern with respect to the licensing requirements in this context by limiting the reach of the requirements to those individuals or corporations who "enter into, engage in, solicit, advertise, bid for, or work at the business of installing wires, conduits, apparatus, fixtures, electrical signs, and other appliances for carrying or using electricity for light, heat, fire alarms . . . or power purposes." Section 5-6-2.
It is well-established that "[u]nless there are compelling reasons for us to do so, [the Court] should not by implication read into the statute what the legislature has not expressed."Woods v. Safeway Sys., 102 R.I. 493, 495, 232 A.2d 121, 122
(1967) (quoting Adelson v. McKenna, 55 R.I. 363, 365,181 A. 799, 800 (1935)). Where the statute at issue is neither ambiguous nor equivocal, there is no room for statutory construction. Id.
(citing New England Die Co. v. General Prods. Co.,92 R.I., 292, 297, 168 A.2d 150, 153 (1961)). Accordingly, the Court cannot search beyond the statute for a different meaning where no ambiguity exists on the face of the law but, rather, must apply the "plain meaning" of the language. Kastal v. Hickory House,95 R.I. 366, 369, 187 A.2d 262, 264 (1963) (citing Hathaway v.Hathaway, 52. R.I. 39, 41, 156 A. 800, 801 (1931)); 2ASutherland Statutory Construction § 46:01 at 118-20 (Norman J. Singer, 6th ed. 2000). Furthermore, with respect to the interpretation of definition provisions such as § 5-6-1, "[a] definition which declares what a term means . . . excludes any meaning that is not stated." 2A Sutherland StatutoryConstruction § 47:07 at 232 (Norman J. Singer, 6th ed. 2000).
In the case at bar, the Board found that §§ 5-6-1 and 5-6-2
apply to Northeast and Northeast's employees and, therefore, that the plaintiffs violated the statutory requirements by performing electrical work without the proper license. An examination of the record reveals that the Board's interpretation in this instance represents a deviation from the plain meaning of the language of §§ 5-6-1 and 5-6-2.
The record unmistakably shows that Northeast designs and installs lightning protection systems. (May 18, 2005 Hearing Tr. at 26-27.) Neither the company, nor any of its employees, apply for, or receive, electrical permits prior to installing these systems. Id. at 27. Instead, lightning protection contractors are governed by a number of separate regulatory provisions which do not apply to electricians, such as the National Fire Protection Agency and the Underwriter's Laboratories.[9] In his testimony, Barnard explicitly described the installation process, and accentuated its non-electrical nature. Id. at 30-31. Moreover, Barnard testified that Northeast defers to certified electricians any work it comes across that may potentially require such certification. Id. at 40. Additionally, the legislature defined "electric contractors" within the statute, thereby indicating its intent with regard to the meaning of that term as it is used in § 5-6-1 et seq.
Therefore, because "lightning protection contractors" is not included in that section, the canons of statutory construction mandate that such a definition not be arbitrarily read into the statute. 2A Sutherland Statutory Construction § 47:07 at 227 (Norman J. Singer, 6th ed. 2000) ("such definitions establish meaning where the terms appear in that same act").
Consequently, the Court is persuaded that the General Assembly did not intend for the reach of § 5-6-1 et seq. to extend to entities such as the plaintiffs. To the contrary, the plain meaning of the language in the statute limits its application to those in the business of "installing wires, conduits apparatus, fixtures, electrical signs or other appliances for carrying or using electricity for light, heat, fire alarms . . . or power purposes." Section 5-6-2(a)(1).
 DEFERENCE TO AGENCY INTERPRETATION
Furthermore, the plaintiffs maintain that the Court need not defer to the Board's interpretation of §§ 5-6-1 and 5-6-2 in this instance because that interpretation unreasonably modifies the statute by expanding its applicability beyond that which the legislature intended. It is well-established that the Court is obligated to afford a certain level of weight and deference to an administrative agency's interpretation of its own enabling Act.See Labor Ready Ne., 849 A.2d at 344. However, when it purports to interpret a statute, "an agency cannot modify the statutory provisions under which it acquired power, unless such an intent is clearly expressed in the statute." Id. at 345 (citing Little v. Conflict of Interest Comm'n, 121 R.I. 232,236, 397 A.2d 884, 886 (1979)). Therefore, the deference afforded by the Court to an agency's interpretation is not absolute. Seeid. at 344-45. Rather, "[a] court reviewing the agency's interpretation of the statute as applied to a particular factual situation must accord that interpretation `weight and deference as long as that construction is not clearly erroneous or unauthorized.'" Id. (quoting In re Lallo, 768 A.2d 921, 926
(R.I. 2001)). In this vein, "a reviewing court need not accept an interpretation which is unreasonable" Nat'l R.R. Passenger Corp.v. Boston Maine Corp., 503 U.S. 407, 418 (1992) and, thus, "deference still leaves final interpretive authority in the courts." Koch, Administrative Law and Practice, § 12.33[2](a) (2nd ed. West 1997).
Section 5-6-2 requires the receipt of an electrical license of those entities that work in connection with the installation of "wires, conduits, apparatus, fixtures, electrical signs, and other appliances for carrying or using electricity for light, heat, fire alarms . . . or power purposes." Northeast installs systems which intercept "atmospheric charges" and terminate them harmlessly at the ground. (May 18, 2005 Hearing Tr. at 32, 37.) To conclude that § 5-6-2 applies to the plaintiffs, the Board necessarily had to find that Northeast installs its protective systems in order to harness electricity for light, heat, fire alarms, or power purposes. The Court is satisfied that such a finding in this instance would be to "imply that which the Legislature did not express." Orthopedic Specialists v. GreatAtl. Pac. Tea Co., 120 R.I. 378, 388, 388 A.2d 352, 357 (1978) (citation omitted). Consequently, the result of the Board's interpretation in this instance would be to modify the provision, a result which renders the interpretation erroneous in the view of the Court. See Labor Ready Ne., Inc., 849 A.2d at 345
(citing Little v. Conflict of Interest Comm'n, 121 R.I. 232,236, 397 A.2d 884, 886 (1979)). For the aforementioned reasons, the Court finds that this agency has acted in excess of its statutory authority in extending the reach of chapter 5-6 beyond the scope reasonably intended by the General Assembly.
 CONCLUSION
After reviewing the entire record, the Court finds that the Board's interpretation of §§ 5-6-1 and 5-6-2 in this instance are unreasonable and that the Board's actions pertaining to the plaintiffs represented a violation of its statutory authority. As a result, substantial rights of the plaintiffs have been prejudiced. Accordingly, the Court reverses the Board's decision, thereby vacating the cease and desist orders and quashing all fines imposed in connection with Northeast's work at the Rhode Island Hospital project. Counsel shall submit an appropriate order consistent with this opinion.
[1] July 17, 2003 Contract. Audet had contracted with the general contractor to perform all the electric work on the project.
[2] Rhode Island General Law § 5-6-32 provides that "[t]he director may assess an administrative penalty on any person, firm, or corporation for any violation of the provisions of this chapter, after notice and a hearing, before and upon the recommendation of the [Board]."
[3] Id. at 51. The witness mentioned certain devices — such as the concentric 14-guage ring conductor and the 37-strand conductor — resemble equipment that the layman would associate with electricians. Id. at 51-52. However, these items are, in fact, unique to lightning protection. Id.
[4] Id. at 29. As an example, Barnard testified that occasionally Northeast employees come across circumstances in which they must bond to, or "be common with," an electric ground.Id. at 44. Normally, Barnard notes, his employees are taught to utilize a water pipe adjacent to the electric board in order to secure the sufficient bonding, thereby avoiding any direct contact with the electric board. Id. at 41. However, when there is no available water pipe, then Northeast's employees are instructed to defer to the electric company to perform this particular aspect of the job. Id. at 45.
[5] Id. at 62. The city of Providence Electrical Inspector was present at the hearing but was not asked to testify. Id. at 78. The Inspector did not issue a violation in this instance.Id.
[6] The Board recommended a $1500 fine and a $500 fine imposed on Northeast for its violations pursuant to §§ 5-6-2 and 5-6-25, respectively. Id. at 79. The Board also recommended $500 fines be assessed to the two Northeast employees pursuant to § 5-6-2.Id. at 80.
[7] See May 24, 2005 Decisions on Appeal. With respect to Northeast's violation of § 5-6-32, the Director issued a $500 fine. In connection with its violation of § 5-6-2, however, the Director ordered a $500 fine due immediately and suspended the remainder for one year, to be activated should Northeast violate the statute within that period. Id. The Director also suspended the $500 fines assessed against Alan Barnes and Joel Barnes in a similar fashion. Id.
[8] In addition to unreasonable statutory interpretation argument, the plaintiffs also claim that the procedure by which the notices of violations were issued violated the Due Process requirements of notice and hearing as set forth in Article 1, § 2
of the Rhode Island Constitution and the 14th Amendment of the United States Constitution. Because the plaintiffs did, in the end, receive notice and a hearing on the merits of this case, and because this Court's decision is based on other grounds, the Court need not address this issue, which is rendered moot.
[9] Id. at 26, 36-7. In addition, at hearing before this Court, the plaintiffs stressed that — from a liability standpoint — the public is better protected by having a more specialized institution install lightning protection systems. Furthermore, any given project that companies, such as Northeast, participate in will be sufficiently protected because the general contractor must have first obtained a Certificate of Occupancy from the Building Inspector prior to the building being occupied.