[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before the Court for decision is the Defendants' (collectively Beacon) motion to dismiss Count III of Plaintiff's (Heritage) Fifth Amended Complaint for lack of subject matter jurisdiction. Heritage has timely filed an objection thereto. The motion is before the Court pursuant to G.L. 1956 § 8-2-14, § 8-2-13 and Super. R. Civ. P. Rule 12(b)(1).
 Facts and Travel
Beacon is a non-profit, independent, public corporation created by the state to be a worker's compensation insurance carrier of last resort. P.L. 2003, ch. 410 § 3 (a) (formerly G.L. § 27-7.2-2 (a)). Beacon also is known as the Workers' Compensation Insurance Fund or simply, the Fund. Beacon, for the most part, is organized and operated as a domestic mutual insurance company.[1] Id. at § 3 (b). Joseph Arthur Solomon, Jeffrey Carleton Johnson, and Michael Dennis Lynch were officers of Beacon during the time pertinent to this case.
Heritage is a Rhode Island corporation and was a policyholder of Beacon from 1992 through 1995 and 1999 through 2001. In Count III of its Fifth Amended Complaint, Heritage claims that Beacon breached its contract with Heritage by "failing to provide a policy of workers' compensation insurance at the lowest possible price." In support of its claim, Heritage recites a litany of alleged facts that imply that Beacon had the financial wherewithal to lower its prices but did not do so. Specifically, Heritage alleges that:
 1. A 5 million dollar note was alternately recorded in Beacon's financial statements as a policyholders' surplus in 1992/1993, then as a liability in 1993/1994 and then as a policyholders' surplus in 1994/1995.
 2. In its fifth year of existence, Beacon's net profit was 23 million dollars.
 3. In its ninth year of existence, Beacon bought property and built a building valued at 15 million dollars.
 4. Beacon purchased investment property in Warwick.
 5. In 2001, Beacon announced that it would not pay dividends due to market uncertainty resulting from the September 11th attacks, yet two years later, invested 20 million dollars in a for-profit insurance company, Castle Hill.
 6. In less than two years after Beacon announced that it would not pay dividends, it had a 110 million dollar surplus.
 7. Beacon's financial statements do not reflect Beacon's majority interest in for-profit insurance companies.
 8. Beacon does not pay taxes, nor does it contribute to the Rhode Island Insurance Insolvency Fund.
 9. In December 2004, the National Council on Compensation Insurance recommended that workers' compensation rates in Rhode Island be reduced by 20 percent. Although other workers' compensation insurance companies followed the Council's recommendation, Beacon did not.
 10. Beacon created and invested in subsidiary for-profit insurance companies and the officers and directors of Beacon are also the officers and directors of the subsidiary companies.
 11. In 2003, the direct premiums written by Beacon was over 106 million dollars while its closest competitor only wrote approximately 3 million dollars.
Heritage's prayer for relief includes ordering Beacon to refund all premiums in excess of "the lowest possible price" in accordance with P.L. 2003, ch. 410, § 3 (a), attorneys' fees, expenses and any other equitable remedy that the Court may find appropriate.
The travel of this case includes a written decision, found at 2004 R.I. Super. LEXIS 29 (January 21, 2004), in which this Court dismissed certain of Heritage's claims contained in its Third Amended Complaint. There, it held that § 27-9-51, governing the return of excess profits, did not create a private cause of action and the complaint's allegations were not sufficiently specific to rebut the business judgment rule. The Court later dismissed certain claims from Heritage's Fourth Amended Complaint in a bench decision on November 22, 2004. Inter alia, the Court held that those claims in the complaint should be brought before the Department of Business Regulation (DBR). Tr. at 24, 25. When Heritage asked for clarification about which claims should be brought before the DBR, the Court responded, "Anything over which the DBR has primary jurisdiction, yes." Tr. at 25.
 Rule 12 (b) (1) and Administrative Law
Rule 12 (b) (1) allows an adverse party to raise by motion the affirmative defense that the Court does not have subject matter jurisdiction over the case. Beacon argues that the Court does not have subject matter jurisdiction because Heritage's claim is based on insurance regulations which fall squarely within the jurisdiction of the DBR. Heritage counters that the Superior Court, rather than the DBR, has jurisdiction to resolve breach of contract and equitable claims.
Dismissal is appropriate where the plaintiff has failed to exhaust its administrative remedies. Almeida v. Plasterers' and Cement Masons' Local40 Pension Fund, 722 A.2d 257, 259 (R.I. 1998). "The general rule is that a plaintiff first must exhaust his administrative remedies before seeking judicial review of an administrative decision." Id. at 259 (Emphasis added); R.I. Employment Security Alliance v. Department of Employment Training, 788 A.2d 465, 467 (R.I. 2002) ("It is well settled that a plaintiff aggrieved by a state agency's action first must exhaust administrative remedies before bringing a claim in court.) (Emphasis added). The exhaustion rule applies where a claim is cognizable in the first instance by an administrative agency. U.S. v. Western PacificRailroad Co., 352 U.S. 59, 63 (1956). Judicial review is withheld until the administrative process has run its course in order to promote the proper relationship between the courts and administrative agencies charged with particular regulatory duties. Id. Furthermore, the exhaustion rule "aids judicial review by allowing the parties and the agency to develop the facts of the case, and it promotes judicial economy by avoiding needless repetition of administrative and judicial fact finding, perhaps avoiding the necessity of any judicial involvement." Almeida,722 A.2d at 259.
A corollary to the exhaustion rule is the doctrine of primary jurisdiction. Primary jurisdiction applies where:
 "a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its review."[2] Western Pacific Railroad, 352 U.S. at 64.
Whether the Court should apply the doctrine of primary jurisdiction depends on the individual case and whether the purposes of the doctrine will be served. Id. The United States Supreme Court has explained that:
 "[it is] now firmly established that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. . . . Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience and by more flexible procedure." Id.
"The doctrine has been applied, for example, when an action otherwise within the jurisdiction of the court raises a question of the validity of a rate or practice included in a tariff filed with an agency." Nader v.Allegheny Airlines, Inc., 426 U.S. 290, 304 (1976). InWestern Pacific Railroad, three railroads sued the United States to recover the difference between the tariff actually paid and the tariff allegedly due on Army shipments of bomb cases filled with napalm gel.352 U.S. at 60. The railroads charged the Government the relatively high rate for incendiary bombs. The Government refused to pay the high rate, arguing that because the burster charge and fuse had not yet been installed, the proper rate was the lower rate for gasoline in steel drums. The Supreme Court upheld dismissal of the case by the Court of Claims, holding that tariff construction and the reasonableness of the tariff were initially matters for the Interstate Commerce Commission. The Supreme Court noted that "complex and technical cost-allocation and accounting problems must be solved in setting the tariff initially."Id. at 66. There were commercial reasons for the different tariffs, for example, the added safety precautions required to handle dangerous cargo, and so a decision concerning tariffs required an intimate knowledge of those very reasons. Id. In other words,
 "Courts which do not make rates cannot know with exactitude the factors which go into the rate making process. And for the court here to undertake to fix the limits of the tariff's application without knowledge of such factors, and the extent to which they are present or absent in the particular case is tantamount to engaging in judicial guesswork."
The last time the Rhode Island Supreme Court addressed the primary jurisdiction doctrine was in Main Realty Company v. Blackstone Valley Gas Electric Company, 59 R.I. 29, 193 A. 879 (1937). The case involved a mill owner who wanted to run electricity through a master meter and then resell it to his tenants. 59 R.I. at 32-33, 193 A. at 881. The electric company refused and the mill owner claimed that he was subjected to undue or unreasonable prejudice or disadvantage by a public utility company in violation of a statute pertaining thereto. Id. at 34; 882. The mill owner sued in Superior Court and the electric company moved to dismiss on the grounds that the dispute was within the province of the state division of public utilities. Id. at 37; 883. The Supreme Court upheld the Superior Court's decision to deny the motion and declined to apply the primary jurisdiction doctrine. The two reasons underlying the Supreme Court's decision were that: (1) unlike the federal cases, there was no urgent necessity or need for uniformity throughout the country, and (2) the Rhode Island Statute only provided for a legal remedy, unlike the Interstate Commerce Act, which explicitly provided both a legal and administrative remedy. Id. at 38; 884.
Despite the fact that the Rhode Island Supreme Court did not follow the United States Supreme Court in Maine Realty, it does not follow that this Court cannot apply the doctrine of primary jurisdiction to this case. At the time Maine Realty was decided, the Rhode Island Administrative Procedures Act had not yet been enacted.[3] Furthermore, the statute inMaine Realty did not provide for an administrative remedy, whereas here, as demonstrated below, it is quite clear that the legislature intended that disputes regarding the rate setting and conduct of insurance companies be resolved in an administrative forum.
Both the exhaustion rule and the doctrine of primary jurisdiction are "prudential rules created by the courts to allocate between courts and agencies the initial responsibility for resolving issues and disputes." Richard Pierce, et al., Administrative Law and Process, 206-07 (3rd ed. 1999). However, they are substantively distinct. Primary jurisdiction deals with whether a court can be the first avenue of resolution or whether the dispute must be reviewed by an agency first. Exhaustion mandates that when a party is currently before an agency, the party must stay within the agency until all possible agency procedures are completed. William Fox, Understanding Administrative Law, § 69 (2d ed. 1997). Rhode Island case law reflects this distinction. As emphasized above, cases involving exhaustion contemplate that an administrative agency has already become involved in the case. Because a state agency is not yet involved in the case before the Court, the proper analytical framework is the doctrine of primary jurisdiction rather than exhaustion.
 Analysis
In 1939, the General Assembly created the DBR. P.L. 1939, ch. 660 § 120. One of the DBR's functions is to regulate and control insurance. In furtherance of the DBR's regulatory powers, the General Assembly also granted the director of DBR enforcement powers. § 42-14-16. Whenever the director has cause to believe that an insurance company has violated the general laws or regulations governing insurance (title 27 and the regulations promulgated thereunder), the director may, in accordance with the Administrative Procedures Act, § 42-35-1 et seq., take a number of remedial actions including: revoking the insurer's license, levying a fee or penalty, ordering the violator to cease and desist, requiring the insurer to conform with the laws and regulations or any combination of the above. § 42-14-16 (a) (1-5). Furthermore, the Rules of Procedure for Administrative Hearings promulgated by the DBR (DBR Rules) provide that:
 "A complaint may be made by any person[4] against any Licensee.[5] . . . The Department or the applicable Division therof shall make an initial determination whether or not the complaint is within the Department's jurisdiction. If no jurisdiction exists, the Department shall notify the complainant in writing. If jurisdiction exists, the Department shall conduct whatever investigation it deems appropriate, including forwarding a copy of the complaint to the Respondent."
Upon completion of the investigation, the Department shall take one of the following actions:
 "(1) If the Department determines that the complaint fails to establish Reasonable Cause,[6] the Department shall take no action on the complaint and advise the complainant and Respondent in writing of the determination; or
 (2) If the Department determines that the complaint establishes Reasonable Cause, the Department shall take such action as it deems appropriate under applicable law and the rules and regulations adopted pursuant thereto.
In light of the above, it is clear that the Legislature created an exclusive administrative procedure to address grievances concerning the conduct of insurance companies.
Heritage tries to remove itself from the Administrative Procedures Act by couching its claim as an ordinary breach of contract and equitable relief. Claims for breach of contract properly come before the Superior Court under its general jurisdiction over actions at law for the jurisdictional amount. § 8-2-14. Indeed, there is no small number of cases before the Court involving breach of contract where the contract in question is an insurance policy. Here, Heritage claims that Beacon's charter creates a contractual obligation to provide workers' compensation insurance at the lowest possible price.
Beacon's charter states that the purpose of the Fund is to "ensure that all employers in the state of Rhode Island have the opportunity to obtain workers' compensation insurance at the lowest possible price." P.L. 2003, ch 410 § 3 (a). Public corporation charters create a contract between the public corporation and its shareholders. In Re Nat'l. Mills,133 F.2d 604, 609 (7th Cir. 1943) ("It is established law that a corporate charter is a contract of a threefold nature. It forms the basis for a contract between the State and the corporation, the corporation and its stockholders, and the stockholders inter sese."). Because Beacon is organized as a mutual insurance company, its policy holders have an ownership interest in the corporation akin to that of a shareholder. See
e.g. § 27-1-40 (allowing for conversion of a mutual insurance company to a stock form of organization upon two-thirds affirmative vote by the board of directors and one-half affirmative vote by its members or policyholders). Therefore, the provisions of Beacon's charter constitute the terms of a contractual agreement between Beacon and Heritage, as well as with the state.
It is also true that the "construction of a corporate charter is a question of law, and it is the plain meaning of the words used in the contract that governs its interpretation." 7A Fletcher Cyclopedia ofCorporations, § 3640 at 229 (Perm. ed. 1997). But it is in construing the terms of Beacon's charter that the DBR's jurisdiction over this matter becomes evident. The DBR not only has the expertise required to make a determination about what the lowest possible price would be, but the legislature clearly intended that the DBR make such determinations. The price of worker's compensation insurance is derived by a complicated process that is based in large part on the rate setting procedures of the DBR. Beacon's charter provides that Beacon "shall be subject to rate regulation under chapter 7.1 of title 27." P.L. 2003, ch. 410 § 11 (c) (1). Under that chapter, workers' compensation insurance companies must file their risks and premium rates with the director of DBR. § 27-7.1-2; § 27-7.1-5.1 (a) (1). The director is then charged with reviewing the filings as soon as possible in order to determine whether they comply with the requirement that the rates not be excessive, inadequate, or unfairly discriminatory. § 27-7.1-4.1; § 27-7.1-5.1 (a) (2) (iii). In making this determination, the DBR shall consider a myriad of factors including but not limited to: past and prospective loss experience, reasonable margin of profits and contingencies, dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders, and provisions for special assessments. § 27-71-4.1 (3).
The DBR is the proper authority to provide an initial interpretation of the meaning of "lowest possible price." The term is not defined in the insurance statutes or regulations. Heritage urges that there is only one meaning of the term and that is its ordinary meaning. However, Beacon points out that price could be synonymous with rate because the definition of rate includes:
 "rate of premium, policy and membership fee, any other charge made by an insurer for or in connection with a contract or policy of workers' compensation insurance and employer's liability insurance, prior to application of individual risk variations based on loss or expense considerations and does not include minimum premiums." § 27-7.1-1.1 (13).
Beacon counter-argues that if the legislature intended that lowest possible price mean lowest possible rate, it could have said so. Resolution of the meaning of the term in controversy lies in the first instance with the DBR because it is the agency charged with the enforcement of the provision. See Labor Ready Northeast, Inc. v.McConaghy, 849 A.2d 340, 345 (R.I. 2004). Once the DBR has applied its superior expertise to the question, its determination will be entitled to due deference by this Court. Id.
Heritage argues that Beacon's motion to dismiss should be denied because the Court may invoke supplemental jurisdiction over transactions arising from the same occurrence even where original jurisdiction may have been in other tribunals. Heritage cites to Lubecki v. Ashcroft,557 A.2d 1208, 1212 (R.I. 1989) in support of this argument. Furthermore, Heritage argues that there is no evidence that the Legislature intended to divest the Superior Court from adjudicating contract disputes. The Court agrees that it has not been divested of its power to hear contract disputes. However, enactment of the Administrative Procedures Act and the creation of the DBR was clearly a legislative effort to provide an administrative forum for this kind of dispute.
The same reasoning would apply to Heritage's prayer for equitable relief. Claims for equitable relief are within the original jurisdiction of the Court pursuant to § 8-2-13. However, there are underlying issues of fact that require the expert determination of the DBR. Moreover, DBR itself can order the kind of equitable relief that the Plaintiff seeks such as a cease and desist order.
 Rule 11 Sanctions
Rule 11 of the Superior Court Rules of Civil Procedure provides that:
 "the signature of an attorney or party constitutes a certificate by the signer that . . . to the best of the signer's knowledge, information, and belief formed after reasonable inquiry [the pleading, motion or other paper] is well grounded in fact. . . . If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose . . . any appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee."
Rule 11 sanctions have a dual purpose: to deter repetition of the harm, and to remedy the harm caused. Michalopoulos v. C D Rest., Inc.,847 A.2d 294, 300 (R.I. 2004). The Court "has the discretionary authority to fashion what it deems to be an `appropriate' sanction, one that is responsive to the seriousness of the violation under the circumstances and sufficient to deter repetition of the misconduct in question." Id.
(citing Lett v. Providence Journal Co., 798 A.2d 355, 368 (R.I. 2002)).
Beacon contends that Heritage should be sanctioned for bringing substantially the same claims in its Fifth Amended complaint as its prior complaint, knowing that the Court had previously held that the claims should be brought before the DBR. The Court does not believe that Heritage has engaged in sanctionable conduct and so declines to grant Beacon's motion.
 Conclusion
Beacon's motion to dismiss the third claim of Heritage's Fifth Amended Complaint for breach of contract is granted because Heritage's claims belong before the DBR. Beacon's motion for sanctions is denied. Order to enter consistent with the decision herein.
[1] Except as provided in § 3 (c), § 11 (c), or in the act.
[2] If a dispute, rather than an issue, is within the primary jurisdiction of an agency, the court will dismiss the action on the basis that it should be brought before the agency instead. Richard Pierce, et. al, Administrative Law and Process, 206 (3d ed. 1999).
[3] The Administrative Procedures Act was enacted in 1962. P.L. 1962, ch. 112.
[4] Person is defined as any individual, partnership, corporation, limited liability company, association, governmental subdivision, public or private organization or any other entity however formed. DBR Rules § 3 (I).
[5] Licensee is defined as a holder of a License, a document issued by the Department granting permission required by law in order to engage in certain activities. DBR Rules § 3 (G, H).
[6] Reasonable Cause is defined as existence of a set of facts of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs which would induce a reasonably intelligent and prudent person to believe that a violation of law, rule, or regulation has occurred. DBR Rules § 3 (K).