DECISION
In these consolidated cases, the Providence Water Supply Board ("PWSB" or "Plaintiff") appeals from four decisions of the Board of Assessment Review ("Board") rejecting its application for forest land tax classification. Jurisdiction is pursuant to G.L. 1956 § 27-44-6.
For the reasons set forth below, the Court reverses the decisions of the Board and finds as follows: Plaintiff's application for classification as forest land was timely; Plaintiff's appeal is not barred by the doctrine of administrative finality; and Defendant, Karen Beattie, Assessor of Taxes of the Town of Scituate ("Beattie," "assessor," "Scituate," or "town"), erred when she rejected the forest land designation. She exceeded her powers when she substituted her opinion for that of the Director of the Department of Environmental Management ("DEM"). The tax assessor and the Board violated well-established rules of statutory construction when they attempted to determine the legislative intent of a clear and unambiguous statute.
 FACTS AND TRAVEL History
Plaintiff is a non-profit quasi-municipal entity which operates the water utility for the City of Providence and other areas within its jurisdiction. See P.L. 1915, ch. 1278, § 1 (establishing PWSB and setting forth the rationale behind its creation); see generally Joslin Mfg. Co. v. City ofProvidence, 262 U.S. 668 (1923) (describing PWSB's origins, legislative charges, and limitations). PWSB obtains its water supply from a number of surface water reservoirs positioned throughout the central region of the state, including one located in the Town of Scituate. See P.L. 1915, ch. 1278, § 5 (outlining the area originally condemned in favor of PWSB). The forest area maintained around the reservoir, as well as a sand filter filtration plant, provides the necessary treatment for the water. (2/21/02 Hearing Tr. at 110.) Plaintiff then transmits the water through a retail and wholesale distribution system. Seeid. at 74 (delineating costs of Plaintiff's distribution system); see also PWSB, http://www.provwater.com (expounding upon nature of Plaintiff's operations). In 1915, the General Assembly enacted a statute permitting the City of Providence to condemn certain properties in Scituate in order to build a reservoir and watershed surrounding that reservoir. See P.L. 1915, ch. 1278. Section 4 of that Act establishes the PWSB with the following mandate:
 "[F]or protecting and preserving the waters in such reservoir or reservoirs and the waters of said river and its tributaries flowing thereto, from pollution, and from the deposit therein of any matters which would reduce the quality or value of any such waters as a potable water supply and for filtration and other works for treating such water supply." Id. at § 4.
PWSB functions like a commercial enterprise. See P.L. 1915, ch. 1278, § 1 (creating a board of directors to control PWSB's business operations). Yet, since its creation, nearly all of its operations have been governed in some fashion by either municipal, state, or federal regulations. See, e.g.,
Providence City Code, Art. III, § 21-65 (giving the city council authority to regulate Plaintiff's finances); PWSB, http://www.provwater.com (itemizing various municipal and governmental bodies authorized to control aspects of the Plaintiff's business). Because only a small percentage of the land owned by PWSB is actually made up of the reservoir, the Plaintiff created a Forest Management Program devoted to sustaining the forestry resources on the property.[1]
Since its inception, PWSB has been at odds with the Town of Scituate relative to the issue of property taxation. In 1926, it sued the tax assessor for alleged excessive taxation. SeeProvidence v. Hall, 49 R.I. 230, 142 A. 156 (1928). The issue in that case was certified to the Rhode Island Supreme Court as follows: "Is real estate and improvements thereon belonging to the City of Providence located in the Town of Scituate liable to taxation by the Town of Scituate." Id. The Court rejected PWSB's appeal, alluding to Article I, Section 2 of the Rhode Island Constitution, which provides that "[t]he burdens of the state ought to be fairly distributed among its citizens." The Court found that it "ought not to assume that no consideration was given to the rights of the town, and that property within its limits was deliberately removed from taxation with no compensating advantage." Id. Following the Court's decision inHall, PWSB paid its Scituate property taxes without protest for approximately sixty years.
However, in 1985, PWSB once again attempted to limit its taxation liability. Then, as in the instant matter, PWSB tried to get its property classified as "forest land" under G.L. 1956 §44-27-1 et seq., the Taxation of Farm, Forest and Open Space Land Act ("Open Space Act" or "Act"). The Open Space Act "provides for use value assessment of land to encourage the maintenance of Rhode Island's productive agriculture and forest land."[2] At the beginning of title 44, chapter 27, the General Assembly delineates its policy objectives behind implementation of the Act as follows:
 "(1) That it is in the public interest to encourage the preservation of farm, forest, and open space land in order to maintain a readily available source of food and farm products close to the metropolitan areas of the state, to conserve the state's natural resources, and to provide for the welfare and happiness of the inhabitants of the state.
 (2) That it is in the public interest to prevent the forced conversion of farm, forest, and open space land to more intensive uses as the result of economic pressures caused by the assessment for purposes of property taxation at values incompatible with their preservation as farm, forest, and open space land.
 (3) That the necessity in the public interest of the enactment of the provisions of this chapter is a matter of legislative determination." Section 44-27-1.
The Act provides a mechanism to achieve these policy goals whereby landowners can apply for certification as farmland, forest land, or open space. See §§ 44-27-3, 44-27-4, 44-27-5. For receipt of a forest land certificate, landowners must apply to the DEM. See § 44-27-4. The statute defines "forest land" as follows:
 "Any tract or contiguous tracts of land, ten (10) acres or larger bearing a dense growth of trees, including any underbrush, and having either the quality of self perpetuation, or being dependent upon its development by the planting and replanting of trees in stands of closely growing timber, actively managed under a forest management plan approved by the director of environmental management." Section 44-27-2(2).
Upon receipt of a forest land certificate, the landowner then may apply for tax classification as such, and the tax assessor "shall classify the land as forest land and include the land as forest land on the assessment list." Id. (emphasis added). Should the assessor see fit to deny the forest land classification, the Act permits an aggrieved landowner to appeal the denial to the Board. Id.
In 1985 — as in the instant matter — Plaintiff received a forest land certificate from the DEM; the tax assessor denied the classification; and, after a full hearing on the merits, the denial was upheld by the Board. (See 2/4/85 Letter from Donald T. Gould, Tax Assessor to PWSB; see generally, 4/24/85 Hearing Tr.; 4/25/85 Decision.) PWSB did not appeal the 1985 decision, and the Board's decision became final without review. Thereafter, in 1990, PWSB and Scituate negotiated an agreement to freeze the property value of the 9088 acres for ten years at $8600 per acre. (12/12/01 Hearing Tr. at 48.)
 The Instant Controversy
On January 1, 1999, the legislature created the Rhode Island Farm, Forest and Open Space Land Value Subcommittee "to recommend the methodology and values for the assessment of land for property taxation on the basis of current use for farm, forest, and open space lands, as established by chapter 27 of title 44 and § 44-5-12." G.L. 1956 § 2-4-3.1. On September 11, 2000, the subcommittee recommended a maximum assessed value of $100 per acre for forest land. This value was derived largely from evaluation of tree size and stumpage prices. (See 5/8/00 Memorandum from Christopher F. Modisette to Thomas A. Dupree, Chair of the Open Space Act Subcommittee) (setting forth procedures and reference materials utilized in computing the value.)
On November 21, 2000, following the implementation of the new $100 maximum, PWSB once again applied for, and received, a forest land certificate in connection with its 9088 acres from the Forest Environment Division of the DEM. (12/12/01 Hearing Tr. at 11-12.) At that same time, Scituate was engaged in a town-wide real estate revaluation, thereby affecting the amount of taxes to be assessed. (1/22/02 Hearing Tr. at 51.) To accomplish this task, the town contracted with Neal Dupuis ("Dupuis"), a certified real estate appraiser, to appraise various properties, including PWSB's land. (1/29/02 Hearing Tr. at 73-74.)
On or about January 1, 2001, Beattie mailed notices to all Scituate property owners, except PWSB, affected by the revaluation. (12/12/01 Hearing Tr. at 78.) These communications notified the taxpayers of their respective evaluation and advised them of their right to appeal the assessment. (12/12/01 Hearing Tr. at 79-81.) The town and PWSB were then engaged in negotiations to attempt to reach a new, agreed-upon value for PWSB's Scituate property, as the existing ten-year agreement was set to expire in 2001. Beattie did not provide PWSB with the aforementioned form of notice to which she provided the other Scituate property owners because these negotiations were ongoing. (12/12/01 Hearing Tr. at 81; 1/29/02 Hearing Tr. at 61.)
PWSB did receive certain documents in connection with its negotiations with the town which referred to the proposed new value, none of which were identified as a notice of a new evaluation. (12/12/01 Hearing Tr. at 81-82.) On March 22, 2001, Beattie received a correspondence from Dupuis, indicating that, in his opinion, the PWSB property should be valued at $298,776,400 ("Dupuis appraisal"). (12/12/01 Hearing Tr. at 87-88.) Thereafter, in late March or early April 2001, Beattie presented this appraisal to a PWSB employee. (See 3/22/01 Letter from Dupuis to Beattie; see also 12/12/01 Hearing Tr. at 41-42.)
Subsequently, on June 7, 2001, then counsel for the town sent a proposed land valuation agreement to counsel for PWSB. (See
6/7/01 Letter from Bradford Gorham to Fernando S. Cunha.) In the proposal, counsel references the town-wide revaluation and offers to assess taxes on PWSB's property consistent with the Dupuis appraisal. (12/12/01 Hearing Tr. at 42-43.)
 Application for Classification as Forest Land
On July 1, 2001, PWSB received its annual tax bill in the amount of $4,205,173.35. (See 2001 Tax Bill from Scituate to PWSB.) PWSB takes the position that the receipt of this tax bill constitutes its first actual notice of the revaluation. On July 27, 2001, PWSB submitted an application for classification as forest land, pursuant to § 44-27-4. (See 7/27/01 Application For Classification Of Open Space/Forest.) Beattie denied the application in a letter dated September 6, 2001 in which she notes the following:
 "[T]he intent of the Farm, Forest and Open Space Act is to limit development that may result from the economic pressures of property taxation. The PWSB does not appear unduly burdened by the property taxes for the subject property since tax payments are "pass through" expenses to the ratepayers. The ratepayers do not appear to be unduly burdened by economic pressures resulting from the property tax assessment since the rate structure of the PWSB is one of the lowest within the region. The PWSB land within the Town of Scituate is zoned `Watershed' which does not permit residential development and is therefore not under development pressures. To the contrary, PWSB acquisitions of land within the watershed district are made to further protect the quality of its water."
 "Additionally, the forestry conducted by the PWSB is an intrinsic component of its management of the water supply. The forestry use of the land is a secondary use that results from professional management of the water supply. The primary use of the land is for protection and management of the water supply." (9/6/01 Letter from Beattie to PWSB.)
 Proceedings Before the Board
PWSB took a timely appeal to the Board from Beattie's denial of its application for classification as forest land. The applicable statute instructs the Board to consider testimony or advice from the following sources in entertaining such an appeal: the tax assessor, the landowner(s), the planning board and conservation committees, the office of state planning, the DEM, the dean of the college of resource development, and the conservation district in which the town is located. See § 44-27-4(f). The statute also sets forth the standard of review the Board need apply in determining whether to uphold or reject the issuance of the forest land certificate by the DEM Director. It provides that "[t]he board . . . shall not disturb the designation of the [DEM] Director . . . unless the tax assessor has shown by a preponderance of the evidence that the designation was erroneous." Section 44-27-4(g)(1).
The town and PWSB each filed dispositive motions to be considered by the Board in advance of a hearing on the merits. (See Town's Motion To Dismiss Appeal from Denial of Classification of Forest Land For 9088 Acres; PWSB's Objection to the Town's Motion to Dismiss.)
The town moved to dismiss PWSB's appeal on two grounds: timeliness and administrative finality. The town predicated its timeliness argument on § 44-27-4(c)(1), which provides that, in revaluation years, the application for classification as forest land must be made within thirty days "after written notice of revaluation." The town maintained that PWSB received written notice of the revaluation by virtue of receiving the Dupuis appraisal in late March or early April 2001. In this regard, the town argued that PWSB's application for classification as forest land should have been filed within thirty days following receipt of such notice. It was not filed until July 27, 2001, well after the expiration of the thirty-day window.
PWSB maintained that it did not receive proper written notice of the revaluation within the meaning of § 44-27-4 until July 1, 2001 when it received its tax bill. As such, Plaintiff argued that its application was filed within thirty days and was timely.
The town further argued that PWSB's appeal should be dismissed under the doctrine of administrative finality. The parties stipulated that PWSB's previous application for the same 9088 acres to be classified as forest land was denied by the tax assessor in 1985. (See 2/4/85 Letter from Donald T. Gould to PWSB.) At that time, the Board heard PWSB's appeal, reviewed all the pertinent evidence, and sustained the decision of the assessor. (See 4/25/85 Decision.) No appeal was taken from that decision. The town averred that there had been no material changes since the 1985 decision and, as such, that decision barred any subsequent review of PWSB's application. PWSB argued to the contrary; that there had been sufficient changes since the previous decision to warrant reconsideration of the issue.
The Board heard PWSB's appeal on various dates: November 5, 2001; December 12, 2001; January 22, 2002; January 29, 2002; February 7, 2002; and February 21, 2002. In support of its appeal, PWSB offered testimony from six witnesses and presented the Board with several exhibits.
The Chief of the Division of Forest Environment at the DEM testified that the DEM received PWSB's application for forest land classification in 2000, and, after reviewing the application, the agency concluded that PWSB qualified for the certificate because the acreage met the statutory definition set forth in § 44-27-2(2). (12/12/01 Hearing Tr. at 10-14.) The Plaintiff also offered the testimony of the Principal Environmental Planner in the Land Use Section of the Rhode Island Department of Administration Statewide Planning Program, who stated that part of her job responsibility was to render advice to state water resources boards, and other state agencies, and that — pursuant to the Plaintiff's request — she had reviewed the instant forest land certification and concluded that it was appropriately issued by the DEM. Id. at 30, 33, 37.
In addition, PWSB presented three of its employees to testify on its behalf: the Director of Engineering, the Deputy General Manager for Administration, and the Manager of Water Resources. The testimony from each of these witnesses concerned the economic pressure on the Plaintiff to convey the 9088 acres to residential developers.[3] Furthermore, PWSB offered expert testimony from a certified real estate broker and appraiser to reiterate its argument relative to economic pressure. Id. at 77-78.
PWSB also presented a number of exhibits in support of its position. It submitted to the Board a letter dated October 30, 2001 from the Director of the DEM to Plaintiff's counsel noting that the Director had reviewed the instant certification and that the land in question meets the statutory requirements of §44-27-4. (See 10/30/01 Letter from Jan H. Reitsma, DEM Director, to Michael R. McElroy.) Also submitted was a second letter from the Director to Plaintiff's counsel, dated December 4, 2001, indicating the DEM's support for the Open Space Act. (See 12/4/01 Letter from Jan H. Reitsma, DEM Director, to Michael R. McElroy.)
Next, PWSB offered into evidence a letter, dated October 30, 2001, from the Dean of College of the Environmental and Life Sciences at the University of Rhode Island ("Dean"), to the Board. The Dean indicates that he had reviewed the statute and "failed to note any specific reference that would exclude the Scituate reservoir property from its term." (10/30/01 Letter from the Dean to the Board.) Furthermore, provides the Dean, "[t]here is no evidence to suggest that DEM made an error with the designation of forest land for the 9088 acres in question." Id.
Finally, the Plaintiff admitted into evidence a letter from the Chief of the Department of Administration Statewide Planning Program ("Chief") to Scituate's counsel, dated October 31, 2001. The letter supports the classification as forest land. (See
10/31/01 Letter from John P. O'Brien, Chief of the Department of Administration Statewide Planning Program, to Bradford Gorham.) Admitted in conjunction with the letter was a memorandum from a Department of Administration staff member to the Chief noting the department's support of PWSB's 1985 application and setting forth the reasons therefore, including the fact that "[t]he Tax Assessor failed to demonstrate by any evidence that the land in question was erroneously certified as forest land by the DEM Division of Forest Environment." (10/21/01 Memorandum from Nancy Hess, staff member, to John O'Brien, Chief.)
In defense of the tax assessor's actions, Scituate presented five witnesses to testify before the Board. Beattie herself testified that she rejected the Plaintiff's application for forest land tax assessment because she concluded that PWSB was under no economic pressure to sell the 9088 acres in question. (12/12/01 Hearing Tr. at 51-52.) In support of her conclusion, Beattie noted that PWSB is required to use its property exclusively for water supply protection and that the forestry use of the acreage is merely an "intrinsic component" of protecting that water supply. (1/22/02 Hearing Tr. at 7, 68, 85; 1/29/02 Hearing Tr. at 59.) Furthermore, Beattie stressed that PWSB is not unduly burdened by its tax rate since the payment is pass-through in nature, i.e., the tax rate is reflected directly in its consumer rates. (1/22/02 Hearing Tr. at 11-12, 21.)
Beattie also testified that, in her opinion, it is within the purview of her job description to analyze and resolve how to apply § 44-27-4 and whether to accept or disregard the issuance of a forest land certificate from the DEM. (12/12/01 Hearing Tr. at 47, 53, 62, 102.) In the instant matter, the assessor testified, the DEM issued the certificate by looking only at whether the land in question satisfied the definition of forest land as set forth in § 44-27-2(2) and erroneously neglected to inquire whether the property satisfied the intent of the statute as provided in the legislative declarations expressed in §44-27-1. (1/29/02 Hearing Tr. at 46, 47, 66.)
In addition, Scituate presented three witnesses supportive of the assessor's position. A certified revaluation company owner, whose firm conducted appraisals for all the property in Scituate as part of the 2000 revaluation, testified that he had inspected the property and determined that the forest land acts as a "necessary component to professionally manage the water supply." (1/29/02 Hearing Tr. at 73-74, 76.) Therefore, the witness stated, the forestry is a "secondary intrinsic use," and, moreover, the property does not meet the forest classification for valuation purposes because of the already existing low rate and the pass-through payment system. Id. at 79, 87-88.
Subsequently, the principal broker of a real estate company that sells and appraises real estate testified that the watershed area surrounding the reservoir receives its value from "maintaining a clean supply of water to the reservoir." (2/7/02 Hearing Tr. at 8.) Similarly, the real estate broker testified that the highest and best use of that property is as a watershed to the reservoir. Id. at 9. The witness also noted that forced conversion syndrome typically concerns only the threat of commercial development which is precluded in the instant matter because of the applicable Zoning Ordinances. Id. at 10-11.
Finally, the town presented a professor of environmental natural resource economics from the University of Rhode Island.Id. at 36. This witness pointed out that PWSB only uses its forest management program to comply with the Water Quality Protection Act. Id. at 50. In fact, noted the professor, section 46-15.3 of the Water Protection Quality Act specifically limits PWSB's acquisition of land to that "required to protect the quality of raw water of the water supply system." Id. at 53.
The town also offered into evidence letters from outside parties in support of its position. A letter from the Chairman of the Scituate Plan Commission ("Chairman") to the Board, dated November 2, 2001, supported the proposition that "[t]here is no need `to encourage the preservation' of the forest land [because] it is [the Plaintiff's] inherent duty and obligation to manage the land in a manner to serve the statutory purpose of the watershed, under which it was obtained." (11/2/01 Letter from Jeffrey C. Hanson, Chairman of the Scituate Plan Commission to the Board.) Moreover, according to the Chairman, PWSB's enabling act, and the town's Comprehensive Plan and Zoning Ordinances, precludes the forced conversion syndrome from affecting the property at issue. Id. Furthermore, a letter from the Chair of the Rhode Island Conservation Commission to the Board, dated November 2, 2001, indicated that the Commission had discussed the matter and had voted to support Beattie's decision denying the requested classification. (11/2/01 Letter from Christopher F. Modisette, Chair of the Rhode Island Conservation Commission to Guy B. Angell, Chair of the Board.)
 Decision of the Board
On July 16, 2002, the Board issued its written decision, finding against PWSB on all issues. The Board found that PWSB's application was time-barred, that it violated the doctrine of administrative finality, and that the tax assessor acted correctly in denying the application on the merits. The Board made the following findings of fact:
 "1. PWSB received written notice of the revaluation of its property in late March or early April of 2001. Consequently, the application which was submitted to the Assessor on July 27, 2001 was not timely.
 2. There have not been any substantial or material changes in circumstances since PWSB's 1985 [application]. Consequently, neither the Assessor nor this Board may grant the pending application.
 3. In considering the application of the PWSB, the Division of Forest Environment failed to address the question of whether or not the land is subject to the possibility of forced conversion to more intensive uses as a result of economic pressures caused by the assessment for purposes of property taxation. In other words, no consideration was given to the legislative intent expressed in 44-27-1.
 4. The land was acquired for and is being used for the protection of the quantity and quality of the water which PWSB of Providence sells, and other uses, such as forestry, production of electricity, etc. are minimal and merely incidental to the main purpose.
 5. The land is necessary for the protection of the quality of water in the reservoir and to some extent, for the production of water and it is managed and protected to that end by PWSB of Providence. It is an integral part of the reservoir system which generates $40 million per year in revenue.
 6. PWSB provides water to approximately 60 percent of the population of the State of Rhode Island which leads the Board to the inevitable conclusion that there is no danger that the land will be used for anything except watershed purposes barring a technological miracle.
 7. There are no definite plans to sell or convert any of the land to more intensive uses nor is PWSB under any pressure to do so. On the contrary, the evidence shows that PWSB is not only interested in keeping its own land in a natural state, but it is also intensely interested that adjoining land which it does not own be developed and maintained in a fashion which is least offensive and least threatening to the purity of the water. PWSB's participation in hearings before the Scituate Zoning Board and the Scituate Zoning and Subdivision Regulations and Comprehensive Plan all support the interests of PWSB in maintaining its watershed and the adjoining non-owned watershed in a condition which will not threaten the purity of its water. Therefore, the Board finds that there is no danger of substantial, intensive development of adjoining properties.
 8. PWSB has statutory authority and a continuing program for acquisition of additional watershed land and has continued to acquire such for the past several years.
 9. The testimony of the Assessor shows that this property is assessed for its special use that is, as part of the system for production and protection of quality of water. No matter what the use and assessment of any adjoining land may be, PWSB land is not affected thereby because it is in a special category of its own. Therefore, it is not subject to the `land conversion syndrome.'" (7/16/02 Decision at 8-10.)
In finding that the application was time-barred, the Board concluded that PWSB "was notified of the revaluation of the 9088 acres of land . . . when the Assessor gave Mr. Blodgett, its Manager of Water Resources, a copy of the Neal Dupuis revaluation appraisal in late March or early April of 2001." Id. at 1. Further, the Board found that the doctrine of administrative finality applied to the instant case because "[t]he parties in [the 1985] proceeding and this proceeding are the same; the issues presented are identical; the applicable law has not changed; and there has not been a material or substantial change in circumstance." Id. at 2.
With respect to Beattie's denial of the application on the merits, the Board held that the tax assessor met her burden of showing by a preponderance of the evidence that the DEM's designation was erroneous for its failure to consider the legislative declarations of the Act as set forth in § 44-27-1.Id. at 4. The Board noted that in order to qualify for forest land tax classification, applicants must satisfy not only the definitional requirements in § 44-27-2(2) but also the legislative declarations. The Board agreed with Beattie's finding that PWSB failed to meet those standards because the evidence did not support any contention that PWSB would experience economic pressure to sell its land or convert it to other more intensive uses if it did not receive forest land tax classification. Id.
at 7.
From this decision, Plaintiff took a timely appeal pursuant to § 47-24-6.[4] In each of the following three years, PWSB's property tax invoice continued to be based on the same valuation as submitted by Beattie in 2001. To preserve its right to challenge those invoices, PWSB has renewed its appeal annually, and, upon receipt of each adverse finding from the Board, PWSB filed a timely appeal of the decision to the Superior Court. Those appeals have been consolidated for decision.[5]
 STANDARD OF REVIEW
Section 44-27-6 of the Rhode Island General Laws sets forth this Court's role in reviewing an appeal from a decision of a board of assessment review. That section provides the following instruction:
 "(c) The review shall be conducted by the superior court without a jury. The court shall consider the record of the hearing before the board of assessment review, or city or town council, and if it appears to the court that additional evidence is necessary for the proper disposition of the matter, it may allow any party to the appeal to present that evidence in open court, which evidence along with the record shall constitute the record upon which the determination of the court shall be made. The court shall not substitute its judgment for that of the board of assessment review, or city or town council, as to the weight of the evidence on question of fact. The court may affirm the decision of the board of assessment review, or city or town council, or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the board of assessment review, or city or town council, by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
Said standard is akin to that prescribed in the Administrative Procedures Act, which affords persons aggrieved by final agency decisions an appellate process within this Court. See G.L. 1956 § 42-35-15. When reviewing an appeal of an agency decision, "[t]he Superior Court is not to substitute its judgment on questions of fact for that of the agency whose actions are under review." Barrington Sch. Comm. v. Rhode Island State LaborRelations Bd., 608 A.2d 1126, 1138 (R.I. 1992) (citing Lemoinev. Dep't of Mental Health, Retardation and Hosps., 113 R.I. 285,291, 320 A.2d 611, 614-15 (1974)). If there exists competent evidence in the record, the Court is required to uphold the agency's conclusions. Id. However, the Court may reverse the agency's decision "where the record before [it] is devoid of any legally competent evidence upon which the agency could have relied in reaching its decision." Millerick v. Fascio,120 R.I. 9, 14, 384 A.2d 601, 603 (1978) (citing Papineau v. Pers. Bd.,101 R.I. 359, 361-62, 223 A.2d 549, 551 (1966)).
Furthermore, while the Court is precluded from substituting its judgment for that of the agency with respect to the credibility of witnesses or the weight of evidence concerning questions of fact, questions of law are not binding upon a reviewing court.Carmody v. Rhode Island Conflicts of Interest Comm'n,509 A.2d 453, 458 (R.I. 1986). Such questions may be freely reviewed to determine what the law is and its applicability to the facts.Id.
 APPELLATE ISSUES
PWSB alleges that the Board's decision is affected by an error of law; that it was made in excess of the Board's statutory authority; that it is erroneous in light of the reliable, probative, and substantial evidence in the record, and that the arbitrary and capricious nature of said decision represents an abuse of discretion by the Board. As a result, the Plaintiff claims it has had substantial rights prejudiced and now asks this Court to reverse the Board's decision. This Court agrees.
 The Open Space Act
Section 44-27-4(a) of the Rhode Island General Laws provides "[a]n owner of not less than ten (10) acres of forest land may file a written application with the director of environmental management for its designation by the Director as forest land." As noted above, § 44-27-2(2) defines "forest land" as follows:
 "[A]ny tract or contiguous tracts of land, ten (10) acres or larger bearing a dense growth of trees, including any underbrush, and having either the quality of self perpetuation, or being dependent upon its development by the planting and replanting of trees in stands of closely growing timber, actively managed under a forest management plan approved by the director of environmental management." Section 44-27-2(2).
To a landowner who has received a forest land certificate from the DEM, the statute then affords said landowner the opportunity to "apply for its classification as forest land on any assessment list of the city or town where it is located by filing a written application for the classification with the assessor." Section44-27-4(c)(1). The statute mandates that "the assessor shall classify the land as forest land and include the land as forest land on the assessment list." Id.
In the event that the tax assessor declines to classify the property as forest land, the statute gives the aggrieved landowner the "right to file an appeal" to the board of assessment review of the city or town. Section 44-27-4(f). Upon such an appeal, the General Assembly explicitly instructs the board of assessment review that it "shall not disturb the designation of the [DEM] Director . . . unless the tax assessor has shown by a preponderance of the evidence that that designation was erroneous." Section 44-27-4(g)(1).
 Statutory Construction
The plain and unambiguous language of the legislation controlling the instant controversy mandates that Beattie "shall" classify the Plaintiff's 9088 acres as forest land for tax purposes unless she can show the Board "by a preponderance of the evidence" that the Director's designation was "erroneous." Id.
To determine whether the tax assessor erred in rejecting the Director's designation, the Court must first examine the well-established rules governing statutory construction. The rules which apply to judicial review of statutory language clearly apply equally to administrative hearing officers and boards. See Labor Ready Ne., Inc. v. McConaghy, 849 A.2d 340,344-45 (R.I. 2004) (citations omitted) (delineating the parameters of administrative agency statutory interpretation). When the language of the statute is clear and unambiguous, those reviewing it must interpret the language literally, giving the words of the statute their plain and ordinary meanings. Seeid. at 345 (citing Stebbins v. Wells, 818 A.2d 711, 715 (R.I. 2003). Accordingly, when examining an unambiguous statute, "there is no room for statutory construction and [the reviewing body] must apply the statute as written." Tanner v. Town Council,880 A.2d 784, 796 (R.I. 2005) (quoting State v. DiCicco,707 A.2d 251, 253 (R.I. 1998)) (citation omitted).
The purpose of the doctrine is "to give effect to the literal meaning [of a statute] without consulting other indicia of intent or meaning." 2A Sutherland Statutory Construction, § 46:04 at 142 (Norman J. Singer, 6th ed. 2000). Therefore, "[t]he intention of the Legislature controls [the Court's] consideration of the mandatory or discretionary character of statutory provisions," Roadway Exp., Inc. v. Rhode Island Comm'n for HumanRights, 416 A.2d 673, 674 (R.I. 1980) (citing Atlantic RefiningCo. v. Dir. of Pub. Works, 98 R.I. 167, 170, 200 A.2d 580, 581
(1964)) (citations omitted) and "[i]f the words used in a statute are unambiguous and convey a clear and sensible meaning, [the Court] look[s] only to those words to ascertain the intent of the Legislature." Id. (citing State v. Ciarlo, 122 R.I. 529, 533,409 A.2d 1216, 1218 (1980)) (citation omitted).
In this case, both the tax assessor and the Board violated the well-established rules of statutory construction by attempting to determine the legislative intent behind a clear and unambiguous statute. The tax assessor's role was limited to determining whether the DEM Director correctly found that Plaintiff's property met the statutory definition of forest land as set forth in section 44-27-2(2). In accordance with the applicable standard of review, the Board was to determine whether the tax assessor met her burden of proof by showing by a preponderance of the evidence that the Director's designation was erroneous. (7/16/02 Decision at 3.) In reviewing the findings of the tax assessor, the Board emphasized that this issue "depends upon whether or not the land in question qualifies under the legislative declaration set forth in [section] 44-27-1." Id. The Board construed the legislative declarations as a "prerequisite" to forest land classification under the existing statutory scheme. See id.
at 3-4.
Utilizing this interpretative methodology as a guideline, the Board found that the tax assessor did, in fact, show by a preponderance of evidence that the Director's designation was erroneous. Id. at 10. As support for its conclusion, the Board stated that it found the evidence before it tended to show that the Director "failed to address the question of whether or not the land is subject to the possibility of forced conversion to more intensive uses as a result of economic pressures caused by the assessment." Id. at 8. Had he done so, the Board concluded, he would have resolved that the forced conversion syndrome did not apply to the matter at hand because "[t]here are no definite plans to sell or convert any of the land to more intensive uses."Id. at 9. Moreover, "[t]he land is necessary for the protection of the quality of water in the reservoir" and "other uses, such as forestry, production of electricity, etc. are minimal and merely incidental to the main purpose." Id. at 8-9. Consequently, the Board determined that the Plaintiff's application failed the standard set forth in § 44-27-1(2), and, as such, the Plaintiff was precluded from receiving forest land classification in this instance.
The Board's decision is affected by error of law because it construed § 44-27-1 et seq. in a manner inconsistent with the plain, unambiguous language therein. When a property owner, such as the Plaintiff, applies to the DEM for forest land certification, the plain language of § 44-27-4 instructs that "the Director shall examine the land and, if the Director determines that it is forest land, the Director shall issue a certificate." The only other instructive provision within the Act is that defining the meaning of the word "forest land," as described supra. With respect to the interpretation of definition provisions such as § 44-27-2(2), "[a] definition which declares what a term means . . . excludes any meaning that is not stated." 2A Sutherland Statutory Construction, § 47:07 at 232 (Norman J. Singer, 6th ed. 2000).
In this case, the Board found, as a fact, that the 9088 acres "meets the requirements of the statutory definition" of forest land as set forth in § 44-27-2(2). (7/16/02 Decision at 3.) The plain language of the Open Space Act does not require the Director to refer to the financial status of the applicant; to weigh the economic burden that may result as a consequence of the forest land designation; or, in fact, to refer to the condition of the landowner at all. Rather, the plain and unambiguous language of the Act mandates that the Director issue a forest land certificate if the land meets the specified definition; that the tax assessor classify the land as such; and that the Board affirm the designation and classification unless the tax assessor can show that it was erroneous from the outset. To read anything further into the Act would be to "imply that which the Legislature did not express." Orthopedic Specialists v. GreatAtl. Pac. Tea Co., 120 R.I. 378, 388, 388 A.2d 352, 357 (1978) (citation omitted).
The Act instructs the Board to consider testimony or advice from a variety of sources when considering an appeal from the tax assessor's determination. See § 44-27-4(f). The evidence offered from those sources should have been limited to that which was relevant to a determination of whether Plaintiff's property met the statutory definition of forest land as set forth in §44-27-2(2). The Board erroneously considered irrelevant evidence and based its decision thereon.
The Act gives the DEM Director great discretion, similar to that afforded a trial judge sitting without a jury. SeeSanturri v. DiPietro, 818 A.2d 657, 660 (R.I. 2003) (quotingHarris v. Town of Lincoln, 668 A.2d 321, 326 (R.I. 1995)) (citations omitted) ("[t]his Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous"). Likewise, the Act does not invite the tax assessor to consider the issue de novo or to substitute her opinion for that of the Director. See Fournier v. Ward,111 R.I. 467, 472, 306 A.2d 802, 805 (1973) (citing Boudreau v.Holzer, 109 R.I. 81, 85, 280 A.2d 88, 91 (1971)) (reiterating certain limitations inherent in appellate review); see alsoImperial Cas. and Indem. Co. v. Bellini, Nos. 97-2585-P.C., 97-3238-P.C. (R.I., filed Dec. 22, 2005) (holding that findings of fact made by a trial justice in a bench trial will not be disturbed "`unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence or unless the decision fails to do substantial justice between the parties'") (quoting Macera v. Cerra, 789 A.2d 890, 892-93 (R.I. 2002)) (citation omitted).
The tax assessor reviewed the Director's designation de novo and in doing so, exceeded her statutory authority. The Board upheld the tax assessor's decision by erroneously emphasizing certain legislative declarations despite unambiguous statutory directives to the contrary. The Board's decision contravenes legislative intent and, therefore, is in excess of its statutory authority and affected by error of law.
The question of whether the Director's designation was erroneous should have been resolved by virtue of asking whether the Director was clearly mistaken in finding that the property meets the definition of "forest land" as provided in the Act. To that effect, the reliable, probative, and substantial evidence in the record shows that tax assessor did not show by a preponderance of the evidence that the Director's decision was erroneous. To the contrary, the assessor agreed that the 9088 acres was forest land as defined in § 44-27-2(2). (12/12/01 Hearing Tr. at 73.) Moreover, the Board found that "as a fact 
the land . . . meets the requirements of the statutory definition and the rules and regulations of the [DEM]." (7/16/02 Decision at 3.)
The reliable, probative, and substantial evidence in the record reveals that the assessor did not met her burden of showing by a preponderance of the evidence that the issuance of the forest land certificate was erroneous. The Board's decision rejecting that certification is clearly erroneous in light of the evidence and represents an arbitrary and capricious exercise of discretion.
 Administrative Finality
The Board found that the doctrine of administrative finality precludes it from granting the Plaintiff's application. (7/16/02 Decision at 10.) Administrative finality "provides for a qualified and limited preclusion, wherein a second application for substantially similar outcome from an administrative agency is barred unless the applicant can demonstrate a change in material circumstances between the two applications." JohnstonAmbulatory Surgical Assocs., Ltd. v. Nolan, 755 A.2d 799, 809
(R.I. 2000); see also Audette v. Coletti, 539 A.2d 520
(R.I. 1988) (holding that a zoning board's denial bars subsequent application for same relief absent showing of change in material circumstances).
Administrative finality is akin to "administrative res judicata," and the doctrine "has been applied not only to preclude a redetermination of issues in a subsequent administrative proceeding but also to prevent the trial of certain issues in a subsequent court proceeding. . . . Administrative res judicata has [been] applied to agency determinations that were never subjected to judicial review." 5 Jacob A. Stein et al., Administrative Law, § 40.01 (2005) at 40.8-40.12.
In this case, the Board concluded that the same circumstances surrounding the instant application concerned PWSB's 1985 application for forest land classification which was denied by the tax assessor and the Board. (7/16/02 Decision at 2.) PWSB did not appeal the Board's 1985 decision, and, thus, it became final.
The question presented to the Board in that 1985 proceeding was whether "the tax assessor has shown by a preponderance of the evidence that the designation by the division of forest environment of 9088 acres of land owned by the City of Providence as forest land was erroneous." (4/25/85 Decision at 1.) The Board specifically noted at that time that the answer depended on the following:
 "[W]hether or not the land in question qualifies under the legislative declaration set forth in [§] 44-27-1, and in particular, [§] 44-27-1(b), and whether or not qualification under that section is a prerequisite to a determination by the Director of Environmental Management that land should be classified as `forest land' for purposes of taxation under [§] 44-27." Id. at 2.
The Board found that the legislative declarations were, in fact, prerequisites to receipt of the forest land designation, and that the Plaintiff's property did not satisfy those declarations. Id. at 3, 9-11. Accordingly, the instant Board found that administrative finality applies because "[t]he parties in [the 1985] proceeding and this proceeding are the same; the issues presented are identical; the applicable law has not changed; and there has not been a material or substantial change in circumstances." (7/16/02 Decision at 2.) Therefore, the Board concluded that it has no authority to reverse the earlier decision rejecting the classification. Id.
The Board incorrectly applied the doctrine of administrative finality to the case at bar. First, as a matter of law, "administrative action is not final . . . if the first decision was invalid." Nolan, 755 A.2d at 808 (citing Hester v.Timothy, 108 R.I. 376, 384, 275 A.2d 637, 641 (1971)) (declining to apply administrative finality when the first application was denied on a vote for which only four members of the zoning board were present, in violation of a statute requiring all five to be present). The 1985 decision by the Board was not valid because it was predicated on the mistaken presumption that the Open Space Act necessarily requires an inquiry into whether the legislative declarations have been satisfied. (4/25/85 Decision at 3-4.)
In 1985, the Board determined that it had an affirmative duty to consider whether PWSB's 9088 acres required the forest land classification to prevent forced conversion as set forth in the legislative declarations. Id. at 4. In deciding this issue, the Board relied heavily on a 1979 Superior Court rescript in the case of Ajootian v. Derentis, No. 77-3213. It is evident from the Board's decision that it applied this rescript as persuasive legal authority to define its role in reviewing PWSB's application.
The Ajootian matter came to the Superior Court in an application for injunctive relief to require the assessor to reduce valuation. Ajootian had obtained a certificate from DEM designating her land as forest land. Despite the designation, the tax assessor refused to reduce the value of Ajootian's property because the assessor contended that Ajootian's property had already been taxed as forest land prior to the designation. Although it does not appear that the tax assessor was challenging the designation, the Superior Court Justice sua sponte determined that the designation was improper. The Board quoted liberally the following language from the Superior Court rescript inAjootian:
 "`It is obvious that the legislature intended the effect of this section of the law to be prospective in its operation — to apply to a situation wherein the character of the land surrounding that land designated as forest land changed, such as, when land in a rural area has the classification or designation as farm land as set forth in the Rhode Island General Laws, and the owner of adjacent land sold a large tract for the development of a shopping mall or other commercial development. That commercial development of the land adjacent to the farm land would have an immediate effect upon the value of the land still rural and undeveloped. Before the enactment of those sections of the Rhode Island General Laws referred to above which provide for the designation of land as forest land, the owner of undeveloped land would immediately suffer a substantial increase in assessed value and increase in taxes.
 The intention and effect of this legislative enactment is to protect the owner of the land remaining undeveloped from the immediate harmful financial effect on him resulting from commercial development adjacent to his undeveloped land.
 To hold that this section of the laws would entitle an owner of undeveloped land to an immediate reduction simply because the land has been designated as forest land is to give this legislation an effect that was never intended. The effect of this legislation was intended to be a protection against the sudden change in assessed valuations resulting from commercial development of land in a previously undeveloped area. That is the only purpose of this legislation; it does not mandate or require tax assessors to reduce assessed valuation of those lands which were already assessed as undeveloped land or open land." Ajootian v. Derentis, No. 77-3213 at 8-10; see also April 25, 1985 Decision at 2-3.
The Board's reliance on the aforementioned rescript was misplaced because that decision essentially had been vacated by virtue of its subsequent procedural history. To put the issue of administrative finality in perspective, it is necessary to review the travel of the Ajootian case. Shortly before the Board issued its decision in PWSB's 1985 appeal, the Rhode Island Supreme Court issued a decision in Ajootian v. Hazard,488 A.2d 413 (R.I. 1985).[6] The Supreme Court decision details the post-1979 travel of the case and demonstrates that by the time the Board relied on the rescript, it had been rendered moot by virtue of a remand order, an evidentiary hearing and the subsequent Supreme Court opinion.
Ajootian took a timely appeal from the Superior Court decision, and that decision never became final. While the case was pending on appeal, the parties attended a prebriefing conference before a single justice of the Supreme Court. Following that conference, by agreement of the parties, the case was remanded to the Superior Court for an evidentiary hearing to determine the value of the subject tract as forest land. On remand, at the close of evidence, the Superior Court Justice granted the tax assessor's motion to dismiss on the ground that Ajootian failed to present evidence that her property was overvalued as forestland. Ajootian appealed that decision, and, on February 20, 1985, the Supreme Court issued its decision affirming the Superior Court decision. The Court found that the tax assessor was not required to further reduce the assessment because the evidence supported a finding that the assessor had been assessing the property as forest land independent of the Director's issuance of the certificate.Ajootian v. Hazard, 488 A.2d 413. It is abundantly clear from the post-1979 travel of that case that the issue of whether or not Ajootian's property qualified as forest land was resolved in favor of Ajootian even if she did not succeed in obtaining a reduction in her assessment.
In its decision, the Supreme Court did not adopt, nor even comment on the reasoning set forth in the Superior Court rescript. In light of the remand and the Supreme Court decision, it is clear that the Superior Court decision in Ajootian should not have been cited and followed by the Board as though it was binding authority. If anything, the fact that the hearing on remand assumed that the property was properly designated as forest land negates any reliance on the reasoning set forth in the rescript.
As discussed at length, supra, the unambiguous language within the statute confers no authority upon the tax assessor, or the Board, to disregard the issuance of a forest land certificate simply by referencing the legislative declarations in § 44-27-1. The 1985 Board decision was based on an erroneous construction of the law and erroneous reliance on a decision that essentially had been vacated. "Where there is an error manifest on the face of the record of a prior determination, it will not be given resjudicata effect." 5 Jacob A. Stein et al., Administrative Law,
§ 40.01 (2005) at 40.18-40.19.
Moreover, the travel of the Ajootian case represents a material change in circumstances sufficient to preclude the application of administrative finality. "What constitutes a material change will depend on the context of the particular administrative scheme . . . and should be determined with reference to the statutes, regulations, and case law that govern the specific field." Nolan, 799 A.2d at 811. In its 1985 decision, the Board provides six findings of fact as support for its affirmation of the tax assessor's refusal to classify PWSB's property as forest land. (See 4/25/85 Decision at 9-11.) Each of those findings relates directly to the applicant's failure to satisfy the legislative declarations found in § 44-27-1. Id.
(findings concern the manner in which PWSB utilized its property and the lack of financial pressure to convey the land). Accordingly, an ensuing Rhode Island Supreme Court decision relegating inconsequential the very bases for the Board's first decision constitutes a change in a material circumstance in this instance.
Even absent the aforementioned reasoning, the Court would resolve the issue of administrative finality in favor of Plaintiff. The Court is mindful of the fact that Plaintiff is a non-profit quasi-municipal entity which serves an important public purpose. To forever bar PWSB from re-litigating this issue would unduly burden a significant number of the states' taxpayers. Accordingly, after balancing the equities involved in this case, the Court finds that the doctrine of administrative finality does not apply.
 Timeliness
Finally, the Plaintiff argues that the Board's finding that the application for forest land classification was time-barred is erroneous in light of the reliable, probative, and substantial evidence in the record. Section 44-27-4(c)(1) permits a landowner with a DEM-issued forest land certificate to file a written application to the tax assessor for classification within thirty days after written notice of the revaluation or, if there is no such notice, then within thirty days of receipt of its tax bill. The Board found that PWSB's first written notice of the revaluation occurred when Beattie forwarded the Dupuis appraisal to PWSB in late March or early April of 2001. (See 7/16/02 Decision at 1.) Therefore, according to the Board, the Plaintiff's July 27, 2001 application was submitted outside the statutory window in which it had to be filed, and, consequently, the application was time-barred.
Generally, when a statute requires written notice, that "notice should be clear, definite, explicit, and not ambiguous. A notice that is ambiguous, misleading, and unintelligible to the average person who is to be affected by it is insufficient." 58 Am. Jur. 2d, Notice, § 28 (2002). As § 44-27-4 specifically mandates that the thirty-day window at issue shall begin upon "written notice of the revaluation or in its absence after receipt of the tax bill," the reliable, probative, and substantial evidence in this record indicates that the Plaintiff had thirty days from receipt of its tax bill — and not from receipt of the appraisal — in which to file its application. The correct measuring date in this instance is, therefore, July 1, 2001, the date on which PWSB received its annual tax bill reflecting the revaluation amount.
Beattie testified that the notice of revaluation mailed to all Scituate taxpayers on January 1, 2001 — except for the Plaintiff — provided the following information: the proposed valuation amount, indication that this valuation will be the basis for the next tax bill, notice that the proposed valuation does not reflect the 50% assessment ratio or any exemptions, and notice that the taxpayer had a right to an informal hearing to appeal the amount, including whom to call to set up such a hearing. (12/12/01 Hearing Tr. at 79-81.) The Dupuis appraisal did not contain any of this information. Id. at 79-90. In fact, the value for the property listed in the Dupuis appraisal was not even the true revaluation amount. Id. at 89. Moreover, the document made no mention at all of the assessment ratio to be applied. Id. at 89-90.
The reliable, probative, and substantial evidence in the record shows that the Plaintiff reasonably construed the Dupuis appraisal as part of ongoing negotiations relative to a new valuation agreement between it and Scituate. Accordingly, the Court is satisfied that PWSB first received proper written notice of the revaluation on July 1, 2001, when it received its tax bill. Therefore, its July 27, 2001 application was within the thirty-day statutory period. As such, the Board's finding that the application was time-barred is clearly erroneous.
 CONCLUSION
Upon review of the record as a whole, the Court finds that the Board's decision on the merits of the instant controversy is affected by error of law, is clearly erroneous in light of the reliable, probative, and substantial evidence, and represents an arbitrary and capricious abuse of discretion by the Board. Furthermore, an examination of the reliable, probative, and substantial evidence of the whole record reveals that the Board's findings with respect to administrative finality and the timeliness of the application are clearly erroneous. As a result, substantial rights of the Plaintiff have been prejudiced.
For the foregoing reasons, the Court hereby reverses the decision of the Board. The tax assessor failed to meet her burden of proof. The tax assessor is directed to classify the Plaintiff's 9088 acres as forest land for tax purposes. Counsel shall submit an appropriate order consistent with this opinion.
[1] 2/21/02 Hearing Tr. at 101, 110-11; see also PWSB, http://www.provwater.com (describing in detail the purpose of the Forest Management Program). The website provides the following:
 "The Primary goal of the Forest Management Program is to manage forests on the watershed to optimize water production and profit from the sale of timber in a manner that is environmentally sensitive to the local communities. Forest management activities on the more than 12 thousand acres of forest land include:
 • Plan Development
 • Computerized forest stand mapping and database
 • Development of an economic model to support the sustainability of the forest resource base
 • Proactive harvesting program utilizing Best Management Practices to protect water quality
 • Support of private landowner's forest management efforts
 • Support of public education and research efforts.
 "The long range plan is to establish a diverse forest of tree species native to this area that will provide for maximum profitability."
[2] A Citizen's Guide: Farm, Forest and Open Space Act,
Jacquline McGrath and Stephen Morin, Dep't of Envtl. Mgmt. at Introduction.
[3] See generally 2/21/02 Hearing Tr. The Director of Engineering testified that the area in question does act as a "buffer" protecting the water supply in the Scituate Reservoir. (2/21/02 Hearing Tr. at 6, 9, 12, 17). However, the technology exists to allow light residential development in that area while maintaining the filtering treatment necessary to sustain the water quality. Id. Likewise, the Manager of Water Resources indicated that the board of directors had already convened to discuss alternative — more financially feasible — filtration systems. Id. at 107.
[4] This matter was numbered as Civil Action No. 02-5166.
[5] The 2003 Complaint was numbered as Civil Action No. 03-2052. The 2004 Complaint was numbered as 04-0442. The 2005 Complaint was captioned Providence Water Supply Board v. Karen S. Beattie Assessor of Taxes of the Town of Scituate, and Guy B. Angell, Leonard Guglielmi Victor S. Lasorsa, Members of the Town of Scituate Board of Assessment Review and was numbered as 05-1148.
[6] Steven Hazard had since replaced James Derentis as the tax assessor for the Town of Foster. The Board issued its decision on April 25, 1985. The Supreme Court issued its decision inAjootian v. Hazard, 488 A.2d 413 approximately two months earlier, on February 20, 1985.